MYRNA FAYE SKILLING, Plaintiff-Appellee and Cross-Appellant, *v.* RAYMOND I. SKILLING, Defendant-Appellant and Cross-Appellee.

First District (4th Division)    Nos. 79-538, 79-1961 cons.

Opinion filed January 21, 1982.—Rehearing denied March 18, 1982.

Arvey, Hodes, Costello & Burman, of Chicago (Gary David Friedman and Donald F. Spak, of counsel), for appellant.

DeJong, Poltrock & Giampietro, of Chicago (Wayne B. Giampietro and Gregory N. Freerksen, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Respondent, Raymond Skilling, appeals from an order entered in the circuit court of Cook County awarding petitioner, Myrna Skilling, an unallocated sum of maintenance and child support of $16,500 per year payable in equal monthly installments. We vacate this order and remand with directions.

Myrna Skilling cross-appeals from an order entered in the same court which denied her petition for attorney's fees. We reverse this order.

### Myrna Skilling's Petition

On December 6, 1977, Myrna Skilling filed her petition in this case seeking an "original" order for custody and child support of the parties' only child, Keith, age six. In the petition, Myrna alleged that Raymond and she had been divorced in London, England, by a consent decree entered on March 21, 1975. Myrna contended that she presently had custody of Keith and that Keith and she had been living in Chicago since the entry of the London decree. She also alleged that Raymond Skilling had been a resident of Chicago since the entry of the London decree. Myrna contended that she did not have sufficient funds to adequately support Keith and that Raymond had failed and refused to contribute to Keith's support. She asked the trial court to enter an order awarding custody of Keith to her and requiring Raymond to pay child support. She also asked that attorney's fees be awarded to her at the conclusion of the case.

Following a pretrial motion filed by Raymond, Myrna's request for child custody was stricken, apparently pursuant to agreement of the parties, and the case proceeded only on the issue of child support.

### Issues

The primary issues raised by the parties at trial level and on appeal are the following:

(1) Did the trial court have subject matter jurisdiction to entertain Myrna's petition for child support?

(2) Did the London decree bar Myrna's petition for child support?

(3) Should the trial court have exercised "equitable jurisdiction" in this case and entered an "original" order for child support?

(4) Was the trial court prohibited from awarding Myrna attorney's fees?

### Facts

Myrna is a citizen of Illinois and the United States. Raymond and Keith are citizens of the United Kingdom. From 1963 until 1975, Myrna and Raymond lived as husband and wife in London. Keith was born in London in 1971. The parties were divorced in London pursuant to a consent decree entered on March 21, 1975. Shortly before the decree was entered, all the parties moved to Chicago and have resided in Chicago since then. Raymond is an attorney and an officer of an international corporation and is presently earning more than $120,000 per year. At the time of the divorce, Raymond was earning approximately $90,000 per year. Myrna was unemployed before the divorce but was working full

time at the time these proceedings were brought and was earning approximately $13,000 per year.

Under the London decree, the parties were awarded "joint custody" of Keith with Myrna having the responsibility of "care and control" over Keith. Apparently, under English law, this meant that Myrna was to be primarily responsible for Keith's daily care and control, but Raymond was to be allowed to have Keith with him on a reasonable and frequent basis and Raymond was to share in all major decisions concerning Keith's upbringing. The record shows that Raymond usually had Keith with him two to three days a week on the average. Raymond frequently traveled on business and thus in some weeks he would not see Keith but in others he would have Keith for more than two or three days.

The London decree required Raymond to pay all of Keith's educational expenses and to keep in force a life insurance policy in which Keith was the beneficiary. Raymond was also required to pay Myrna "as periodic payments for herself during their joint lives until such date as she shall remarry or further order" the sum of 5,000 pounds per year in equal monthly installments on or before the 21st of each month beginning March 21, 1975. Myrna admitted at trial, and the trial court found, that this was actually an order for unallocated maintenance and child support. Myrna alleged that the parties had agreed that 500 pounds per year would represent child support. Raymond denied this but made no attempt to show what amount was intended as child support.

Under English law the 5,000 pounds were taxable to Myrna. However, Myrna would not personally pay the taxes. Raymond was required to withhold the amount of taxes, approximately 33 percent, from the payments he made and then pay the taxes on Myrna's behalf. Hence, under the decree, Raymond was required to turn over to Myrna approximately 3,350 pounds per year. The exchange rate in effect at the time of the parties' divorce was approximately $2.30 per pound. Thus, when the decree was entered the entire award was worth $11,500 per year, of which Myrna was to receive approximately $7,700, or $650 per month. Of course, Myrna also had to declare the full $11,500 a year as "alimony" taxable to her under United States tax laws. (See 26 U.S.C. §71 (1976).) However, she was allowed a credit for foreign taxes up to the amount of Federal taxes due on the payments, and the net effect was that Myrna's tax on the 5,000 pounds was only the 33 percent withheld by Raymond.

It appears that before Myrna brought her petition, Raymond had actually paid the full amount required by the London decree. However, his monthly payments varied to extremes. For example, in January 1977 he made two payments totaling $800, then in February he made one payment for $120. In June through September 1977, he made equal monthly payments of $812.50, then in October and November, he made

no payments. This failure to make payments in those months caused Myrna to file her petition.

Though Raymond was making payments, the overall amount Myrna was receiving between the time of the decree and the time of the trial court proceedings decreased. Raymond was paying 5,000 pounds per year in varying monthly payments, but the value of the pound in relation to the dollar decreased to approximately $2 per pound. Thus, at the time of the trial court proceedings, Myrna was entitled to receive approximately $6,700 per year rather than the $7,700 she was originally entitled to based on the exchange rate in effect at the time of the parties' divorce. Thus, in dollar amounts, Myrna's payments actually decreased over the years. Moreover, the purchasing power of Myrna's dollars decreased over the years because of inflation.

Several months before Myrna filed her petition in this case, Raymond and she came to a tentative agreement that the total amount of the payments should be increased to $15,000 per year less the amount of the English taxes. The London decree was to be modified by consent to reflect this change. This tentative agreement was never made final and the London decree was not modified.

On May 9, 1978, while the proceedings in this case were in progress, Raymond executed an irrevocable letter of credit with a local bank. The letter guaranteed payments of $12,000 per year less English taxes to Myrna for a period of two years. At trial and on appeal, Raymond attempted to use this letter as proof that Myrna had an adequate remedy at law in this State to enforce payments to her.

At trial, Myrna showed that her average spendable income per year was approximately $18,000, which included the payments from Raymond. In relation to Keith, she was spending approximately $6,500 per year. After providing for Keith and herself, she was not able to save any money, and in fact, had been periodically using savings she had at the time of the divorce to aid in covering expenses for Keith and her.

Raymond was paying for most of Keith's educational expenses as required by the London decree. Raymond was also buying many of Keith's clothes and was paying for some of Keith's medical expenses. Myrna alleged that she had to rely on these "gratuitous" payments to meet Keith's needs. Raymond's spendable income, after taxes and payments to Myrna, was never precisely shown, but even by his own calculations it was more than $50,000 per year. When Raymond had Keith with him, he would pay for Keith's food and entertainment expenses.

According to the testimony of an English solicitor, the London decree was enforceable in England by summary procedures such as contempt. However, since Raymond resided in Chicago, the English court would not resort to contempt unless Raymond could be found in England. The

London decree was also enforceable by attachment of any assets Raymond had in England. However, it was shown that all of Raymond's assets in England were pledged to third parties to cover certain of Raymond's obligations and thus attachment was a doubtful remedy.

The London decree was also modifiable in London. It could be modified by affidavits filed on behalf of the parties if the parties consented to modification. Without consent, Myrna would probably have to travel to England to testify if she wanted a modification. In either case, Myrna would have to bear the expenses of corresponding with English solicitors and the attorney's fees for both Chicago and English lawyers.

Following the trial, the court entered its final order on May 15, 1979. The court found that it had no power to enforce or modify the London decree. The court found that the London decree was valid and that the 5,000 pounds per year provision in the decree was an unallocated award for maintenance and child support. The court found that Keith was being adequately provided for by the combined amounts being spent by Myrna and Raymond.

The trial court declared that Myrna's petition for an original order of child support was not a proceeding covered by the Illinois Marriage and Dissolution of Marriage Act. (See Ill. Rev. Stat. 1979, ch. 40, par. 505.) Nevertheless, the court declared that it had subject matter jurisdiction to entertain the petition under general principles of equity. The court found that there was a need for an enforceable child-support order in this State. The court then ordered Raymond to pay Myrna, effective January 4, 1978, the sum of $16,500 per year in equal monthly installments as unallocated maintenance and child support. The court also ordered Raymond to pay Keith's educational expenses. The court stated that the amounts ordered were the total amounts to be paid, and any amounts paid pursuant to the London decree, including taxes withheld, would be a set-off from the court's order. In other words, as long as Raymond paid $16,500 less the English taxes, Raymond would not be in violation of the Illinois order or the London order.

The trial court also found that it could not entertain Myrna's petition for attorney's fees because the action did not fall under the Illinois Marriage and Dissolution of Marriage Act. See Ill. Rev. Stat. 1979, ch. 40, pars. 505, 508.

Both parties appealed, Raymond from the support order and Myrna from the attorney's fees order. While this appeal was in progress, the United States and the United Kingdom entered into a treaty concerning income taxes. Under one of the provisions of this treaty, Myrna is now only liable for United States taxes on the London decree payments and she may seek a refund of all taxes withheld in England since the entry of the London decree. However, she must also amend her United States tax

returns and pay the Federal taxes for which she previously received a credit.

OPINION

I

*Subject Matter Jurisdiction*

■■ Circuit courts "have original jurisdiction of all justiciable matters * * *." (Ill. Const. 1970, art. VI, §9.) This provision of the Constitution gives the circuit court the general power to determine all matters of controversy arising under common law or equity, or by reason of statute or the Constitution, unless the Constitution requires that a matter be resolved by another body of the government or a higher court.

■■ Problems concerning a court's subject matter jurisdiction often arise when a statute has created a right which has no counterpart in common law or equity. By enacting such a statute, the legislature has created a "justiciable matter." Often, the legislature prescribes that a court's jurisdiction to hear and determine controversies involving a statutory right is limited in that certain facts must exist before a court can act in any particular case. For example, the right to dissolution of marriage is a statutory right having no counterpart in common law or equity. Once the right was created, by reason of the Constitution, our circuit courts automatically acquired the general power to hear controversies concerning the right to dissolution of marriage. However, in creating the right, the legislature prescribed that certain facts concerning domicile had to be truthfully pleaded before a court could acquire jurisdiction to hear any particular case involving dissolution. (Ill. Rev. Stat. 1979, ch. 40, pars. 401(1), 403(3).) In essence, the legislature determined that the right to dissolution of marriage was not a "justiciable matter" falling under the Constitution unless the domicile requirement was met in each case. Though generally the legislature has no power to limit or preclude a court's constitutional jurisdiction to hear a matter (*Ruth v. Aurora Sanitary District* (1959), 17 Ill. 2d 11, 158 N.E.2d 601), an exception to this rule arises when the legislature creates a right having no counterpart in common law or equity and has thus created a justiciable matter. In reality, the legislature is not limiting or precluding a court's jurisdiction over such matters, but is merely defining the justiciable matter it has created.

Raymond argues that the right to child support is a creation of the legislature having no counterpart in common law or equity. Raymond contends that the circuit court's jurisdiction to hear and grant a petition for child support was controlled by section 505(a) of the Illinois Marriage and Dissolution of Marriage Act (IMDMA), which reads in part that a court may enter an original order for child support "[i]n a proceeding for dissolution of marriage or legal separation or declaration of invalidity of

marriage, or a proceeding for child support following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse." (Ill. Rev. Stat. 1979, ch. 40, par. 505(a).) Raymond concludes that since the present proceeding did not fall under any of the proceedings described in section 505(a), the court lacked subject matter jurisdiction to entertain Myrna's petition.

To begin with, there is no indication in section 505(a) that the proceedings mentioned are jurisdictional in nature. Even assuming that the right to child support is a creation of the legislature having no counterpart in common law or equity, the IMDMA is silent concerning any jurisdictional matters that must exist before causes concerning child support become justiciable matters.

Next, matters concerning the welfare of a child in this State, including the duty of the father to support the child, have always been matters within the court's power to determine. Long ago it was recognized that courts of equity could entertain petitions for the support of a child despite the existence or nonexistence of a statute. (*Cowles v. Cowles* (1846), 8 Ill. (3 Gilm.) 435.) Thus, the right to child support is not a creation of the legislature having no counterpart in common law or equity. As a result, we cannot conclude that the proceedings prescribed in section 505(a) of the IMDMA are jurisdictional matters because the legislature would have no power to prescribe the jurisdictional elements of child support matters.

Today, there is no distinction between courts of law and courts of equity, and it is the circuit courts that have jurisdiction to hear and determine matters concerning the welfare of a child, including the *enforcement of the duty of the father to provide reasonable support for the child.* (See *Zalduendo v. Zalduendo* (1977), 45 Ill. App. 3d 849, 360 N.E.2d 386.) Thus, the court in the present case had the subject matter jurisdiction to entertain Myrna's petition for child support. The existence of a statute or a foreign decree is irrelevant to the question of jurisdiction.

In reality, Raymond's argument is not one concerning the jurisdiction of the circuit court but one concerning whether the petition could state a cause of action. When the legislature enacted section 505(a) of the IMDMA did it intend to preclude a party from being able to state a cause of action for child support in any proceeding except one brought pursuant to the statute? In other words, did the legislature intend to abolish all actions that could exist in equity and provide for an exclusive statutory means for seeking an original order of child support?

Occasionally, the legislature enacts statutes that are intended to replace actions that existed at common law or equity and to provide the exclusive means for the future enforcement of existing rights. A prime example is section 72 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110,

par. 72), which provides for the manner in which post-judgment relief may be obtained. Section 72 abolished all actions that existed in common law or equity for post-judgment relief and in their stead established an exclusive means for acquiring such relief. If a party today attempted to bring an action for one of the common law writs or bills of equity that were abolished by section 72, his action would be subject to dismissal not because the court would lack jurisdiction to entertain it but simply because a good cause of action would not be stated.

When the legislature enacts a statute establishing a means for the enforcement of existing rights, there is no presumption that the statutory means is intended to be exclusive and to abolish all other actions at common law or equity, and the legislature must usually express that intent to give the statute such effect. (See *Cedar Park Cemetery Association, Inc. v. Cooper* (1951), 408 Ill. 79, 96 N.E.2d 482; *Frank v. Salomon* (1941), 376 Ill. 439, 34 N.E.2d 424; *Lites v. Jackson* (1979), 70 Ill. App. 3d 374, 387 N.E.2d 1118.) Section 505(a) of the IMDMA (Ill. Rev. Stat. 1979, ch. 40, par. 505(a)) prescribes that a court may enter orders for child support in certain proceedings, but it does not expressly preclude a court from entering child support orders in other proceedings not covered by the statute. The legislature itself recognizes that the proceedings described under section 505(a) of the IMDMA are not exclusive since child support orders may be obtained under the Paternity Act (Ill. Rev. Stat. 1975, ch. 106 3/4, pars. 52, 59). Nothing in section 505(a) or the entire IMDMA indicates that the legislature intended to abolish all actions in equity that existed for child support before the statute was enacted. Thus, Myrna's petition for an original order of child support was a recognizable action in equity.

## II

*Res judicata*

Raymond contends that the existence of the London decree, and the order of unallocated maintenance and child support under that decree, prevented Myrna from seeking an "original" order for child support. Raymond asserts that any right to child support was merged in the London decree and the decree now controls Raymond's duty to support Keith and Myrna's only action can be one for the enforcement or modification of the decree.

Undoubtedly, under the doctrine of comity, we can recognize the validity of the London decree. (See *Clubb v. Clubb* (1949), 402 Ill. 390, 81 N.E.2d 366; *Zalduendo v. Zalduendo* (1977), 45 Ill. App. 3d 849, 360 N.E.2d 386.) But to recognize its validity does not mean that we must

recognize it for all purposes. We would, of course, recognize the divorce as valid. We would also extend to this decree a presumption that the amounts ordered to be paid by the decree were fair and reasonable at the time the decree was entered.

As the trial court found, there is no remedial provision in our law under which our courts may enforce or modify the decrees of foreign nations as to provisions concerning maintenance or child support. (*Zalduendo v. Zalduendo* (1977), 45 Ill. App. 3d 849, 360 N.E.2d 386.) The IMDMA creates a remedy in our courts for enforcing or modifying the maintenance and child support provisions of the decrees of any other State (Ill. Rev. Stat. 1979, ch. 40, par. 511), but is silent on the question of decrees of foreign nations.

■■ Without a method of enforcing or modifying the London decree in this State, we cannot grant recognition to the decree to the extent that it precludes all possible action in this State. In essence, Raymond's argument is that even though all the parties are residents of Illinois, no rights of these parties can ever be adjudicated here. Under Raymond's theory, if Raymond decided to cease payments, the parties would have to go to London to solve the matter. When the welfare of a child is at stake, we believe the doctrine of comity does not require us to leave a child within this State to the protection of a foreign nation.

Thus, we hold that the London decree did not prevent Myrna from bringing an original action for child support in this case. Further, we cannot allow the decree to act as res judicata to matters concerning the present welfare of Keith.

## III

### Equitable Jurisdiction

Raymond contends that the trial court did not have "equitable jurisdiction" to decide this case. Much of Raymond's argument on this point confuses subject-matter jurisdiction with equitable jurisdiction. Equitable jurisdiction bears no relation to subject-matter jurisdiction. Subject-matter jurisdiction concerns a court's power to hear and decide a case. Equitable jurisdiction concerns whether a court which has subject-matter jurisdiction should exercise its discretion and grant equitable relief. *Miller v. Rowan* (1911), 251 Ill. 344, 96 N.E. 285.

In the present case, equity jurisdiction depended on whether Myrna proved a need for an original order for child support. (See *Zalduendo v. Zalduendo* (1977), 45 Ill. App. 3d 849, 360 N.E.2d 386.) As with any equitable action, the need for equitable relief in this case depended first on whether there was an adequate remedy at law. Myrna's only remedy at law was to pursue modification procedures in England. The IMDMA provides a statutory remedy for the entry of original orders of child

support, but that remedy is limited in that such orders can only be entered in conjunction with a dissolution proceeding, a legal separation proceeding, a proceeding for the declaration of invalidity of a marriage, or a proceeding following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse. (Ill. Rev. Stat. 1979, ch. 40, par. 505(a).) No such proceeding was possible in Myrna's case. The IMDMA also provides for modification procedures of the decrees of other States (Ill. Rev. Stat. 1979, ch. 40, par. 511), but is silent on possible modification of the decrees of foreign nations.

Here, Myrna had no remedy at law in this State, and we believe that to require her to pursue her remedies in England cannot be considered "adequate." All of the parties are residents of Illinois. In the absence of consent to modify, Myrna would have to travel to England to obtain relief. Even with consent, Myrna would have to procure the services of English solicitors in addition to any legal services she acquires in this State. Unless Raymond were to return to England, the English court would not be able to use any summary procedures to enforce the English order or any modification of that order.

Raymond argues that Myrna had an adequate remedy at law in this State because of the existence of the irrevocable letter of credit. The letter of credit was not executed until after these proceedings had begun. Myrna refused to accept the terms of the letter. At best the letter could be considered as part of an offer to compromise, but it could not have been considered as the creation of an adequate remedy at law. The letter was binding for two years and has now expired by its own terms. The letter was not enforceable by summary procedures nor modifiable by a court of this State.

Though Myrna had no remedy at law in this State, the mere absence of such a remedy was not enough to show the need for an original order of child support. However, the circumstances of this case indicated that the trial court could have properly determined that such a need existed.

Though it is perhaps true that Raymond had paid Myrna 5,000 pounds per year as required by the English decree, his monthly payments varied to extremes and ceased before Myrna brought the present action. Myrna could not possibly establish a regular budget based on the manner in which the payments were made. She did not know how much her next payment would be, when it would come, or, at the time she brought her action, if it would come. Moreover, her payments in American dollars actually decreased over the years because of the declining value of the pound in relation to the dollar. The payments, along with Myrna's salary, were shown not to be sufficient for Myrna to care for Keith in the standard of living to which Keith had been accustomed at the time immediately after the divorce. Since the time of the divorce, the cost of

living had increased. Though Keith was being adequately cared for at the time of these proceedings, Myrna had to rely on voluntary contributions from Raymond to maintain such care. Such contributions could cease at any time.

Besides a financial need for an original order of child support, other factors of need were also present. Since all of the parties were residents of Illinois, there was a need for an enforceable and modifiable order in this State. The parties should not have to return to England every time a problem develops. There was a need for the court to acquire continuing personal jurisdiction over Raymond so that any future action could be maintained in this State in case Raymond moved out of Illinois.

■■ Thus, under all the circumstances in this case, the trial court could have properly found that a need for an original order of child support existed. However, the order in its present form is improper. Rather than entering a child support order, the court entered a combined maintenance and child support order. No one ever requested a maintenance order, and the court could not enter one. Maintenance following a divorce is a creation of statute and can only be awarded pursuant to an action brought in accordance with a statute. Under section 504 of the IMDMA, a court can award maintenance "[i]n a proceeding for dissolution of marriage or legal separation or declaration of invalidity of the marriage, or a proceeding for maintenance following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse." (Ill. Rev. Stat. 1979, ch. 40, par. 504(a).) No right to an original order of maintenance after a dissolution can arise in any situation not covered by statute. Since no such situation existed in this case, the court could not properly have entered an order for maintenance.

The order as it now stands must be vacated. Accordingly, we vacate the order and remand with directions that the trial court, after a hearing, shall enter an order for child support retroactive to January 4, 1978, the effective date of its original order in this case. Additionally, the order for child support shall provide for Raymond's continuing responsibility to pay for the reasonable educational expenses and the medical and dental expenses on behalf of Keith. The order shall also include a provision continuing Raymond's responsibility to maintain a reasonable amount of life insurance with Keith as beneficiary to secure the support, education, and related allowances provided for on behalf of Keith.

As for allowing a set-off for payments made under the London decree, a set-off should be allowed only to the extent the payments made under the London decree represent child support. The court shall hold a hearing to determine what portion of those payments was intended by the parties to be child support. The court shall consider in determining the amount of the award the effect its order will have on the parties' re-

spective tax situations under Federal law, and shall also consider the effect the new tax treaty has on the parties' situation. Until the trial court enters a new order, Raymond shall pay Myrna, effective as of January 1, 1982, the sum of $800 a month as child support with no set-off for payments made under the London decree. Appropriate adjustments may be made when the trial court enters its final order.

## IV

### Attorney's Fees

■■ The trial court refused to entertain Myrna's petition for attorney's fees because it found no statutory authority for allowing such fees. As a general rule, attorney's fees are not recoverable from an unsuccessful litigant in the absence of statutory authority. (*Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859.) However, in *Zalduendo v. Zalduendo* (1977), 45 Ill. App. 3d 849, 360 N.E.2d 386, this district court held, in a situation similar to the present one, that attorney's fees should be recoverable in actions concerning child support which did not arise under statute but arose under general principles of equity. The decision held that a court of equity could award attorney's fees under the same powers by which it could award child support because otherwise "the right of a child to support would indeed become a hollow one." 45 Ill. App. 3d 849, 859, 360 N.E.2d 386, 393.

We see no just reason for not following *Zalduendo*. It is true that no statute allows attorney's fees in this case. However, the situation does fall within the spirit of legislative enactments. This case could not be brought under the IMDMA simply because the legislature, when it adopted the IMDMA, did not foresee every possible factual situation that would arise.

The legislature has shown a conscious desire to allow attorney's fees in cases involving child support. Attorney's fees are recoverable under the IMDMA when child support is sought (Ill. Rev. Stat. 1979, ch. 40, par. 508) and under the Paternity Act when child support is sought (Ill. Rev. Stat. 1975, ch. 106 3/4, par. 59). Thus, in this case, we are faced not with the absence of statutes showing a legislative intent to allow attorney's fees in cases such as the present one, but merely the absence of a statute pertaining to the particular facts of this case, which facts were overlooked by the legislature when it adopted the IMDMA.

■■ Thus, under the authority of *Zalduendo*, we believe the trial court could have awarded Myrna attorney's fees in this case. On remand the trial court will entertain the request using the guidelines of section 508 of the IMDMA (Ill. Rev. Stat. 1979, ch. 40, par. 508) and cases decided thereunder.

We are aware that the trial court, in determining the amount of fees, will consider all the facts before it. We note that this case has lasted four

years. The record is voluminous. Our review of that record indicates that most of the proceedings in this case were unnecessary and could have been avoided if both parties had been able to put aside their contempt for each other. Throughout, the parties have adamantly refused to compromise on the most minor of points. The record abounds with needless motions, objections, and accusations on both the trial and appeal level. We find it incredible that attorneys could spend endless hours of valuable court time arguing over useless points such as whether a brief contains a statement of facts, whether an economist could read a market quotation from a Wall Street Journal, and whether a copy of a statute found in an unofficial reporting service could be submitted to the court.

We question the parties' true motive for pursuing these proceedings. Were the parties primarily concerned with the welfare of Keith or were they merely using the courts as means for further personal attacks upon each other? The record indicates the latter. Who but the trial court was truly concerned with Keith's welfare in this case? Did the parties ever consider the impact these drawn out proceedings could have on Keith? Concerned parents, guided by skillful counsel, could have quickly and equitably resolved the matters in controversy without imposing an outlandish burden on the patient trial court. Before these proceedings began the parties had a tentative agreement for Raymond to pay a total of $15,000 per year to Myrna for maintenance and child support. Now, four years later, Raymond is pursuing an appeal from an order which required him to pay $16,500 per year. Here is a party making more than $120,000 per year pursuing a costly and drawn out appeal over whether his son should have $100 more per month for his welfare than the party was originally willing to pay. We are also aware of the fact that Myrna refused the compromise offer presented by Raymond and that the parties remained stalemated. We know that the trial court will consider the record before it carefully when it determines what *reasonable* attorney's fees, if any, should be awarded in this case.

For the reasons noted, we vacate the order awarding unallocated maintenance and child support, reverse the order denying petitioner's request for attorney's fees, and remand the cause for further proceedings with directions.

Vacated in part, reversed in part, and remanded.

JOHNSON, P. J., and ROMITI, J., concur.