*In re* MARRIAGE OF CARL M. VERNON, Petitioner and Counterrespondent-Appellant, and RUTH E. VERNON, Respondent and Counterpetitioner-Appellee.

Fourth District  No. 4—92—0889

Argued April 13, 1993.—Opinion filed November 30, 1993.

LUND, J., concurring in part and dissenting in part.

Marilyn B. Resch and William B. Totten (argued), both of Parker, Siemer, Austin & Resch, of Casey, for appellant.

Priscilla Ragle Ebdon (argued), of Charleston, for appellee.

JUSTICE COOK delivered the opinion of the court:

A judgment was entered on October 5, 1992, which dissolved the marriage between appellant Carl M. Vernon and appellee Ruth E. Vernon, and addressed the issues of division of property and debt, maintenance, and attorney fees. Carl appeals, contending the trial court erred in (1) the distribution of marital assets and debts; (2) the maintenance award to Ruth; (3) ordering Carl to keep Ruth as sole beneficiary on his life insurance policy; and (4) the distribution of Carl's retirement pension. We affirm.

Carl and Ruth were married on August 31, 1962, and had two children, Russell Eugene Vernon, and Ricky Monroe Vernon, both of whom were emancipated at the time of the dissolution proceedings. On October 30, 1990, Carl filed a petition for dissolution of marriage and, on November 28, 1990, Ruth filed a counterpetition.

Following hearings on grounds for dissolution of marriage and the issues of property distribution, maintenance, and attorney fees, the trial court issued an opinion letter listing its findings of fact and rulings of law. Then on October 5, 1992, the trial court entered a judgment which gave Ruth the marital residence, the bulk of the tangible household personal property, the 1983 Buick automobile, all of the financial assets in her possession or name, one-half of Carl's pension account with his employer (EMRO Marketing Company (EMRO)), the personal property in her possession, the upright freezer, and the riding mower. Carl received a portion of the personal property, including his tools, the slide projector, the Canon camera, the home computer, the telescope, the steel safe in the garage, the snowblower, and one-half of the yard tools. Carl also received the original copy of the scrapbook of his son's accomplishments, all of the financial assets in his possession or name, one-half of his pension account with EMRO, one cemetery lot, and the assets of his publishing venture. Ruth was ordered to pay the balance of the mortgage on the marital residence, while Carl was required to pay all of the remaining marital debts. Finally, the judgment of dissolution of marriage ordered Carl to (1) pay Ruth temporary maintenance of $950 per month for three years, (2) pay Ruth's health insurance for one year, and (3) maintain life insurance through his employment, naming Ruth as sole primary beneficiary until further order of the court.

Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)) grants the trial court discretion to divide marital property into "just proportions" taking into consideration all of the factors listed therein, as well as others deemed relevant to the case. (*In re Marriage of Nuechterlein* (1992), 225 Ill. App. 3d 1, 8, 587 N.E.2d 21, 25-26; *In re Marriage of Riech* (1991), 208 Ill. App. 3d 301, 308, 566 N.E.2d 826, 830.) The touchstone of proper apportionment is whether it is equitable in nature, with each case resting upon its own facts. (*In re Marriage of Hart* (1990), 194 Ill. App. 3d 839, 847, 551 N.E.2d 737, 741.) The trial court's discretion in these matters will not be disturbed absent a clear abuse, *i.e.*, if no reasonable person could adopt the trial court's position. (*Nuechterlein*, 225 Ill. App. 3d at 8, 587 N.E.2d at 26; *Hart*, 194 Ill. App. 3d at 847, 551 N.E.2d at 741.) An apportionment of personal

property by the court need not be accompanied by an exact evaluation. *In re Marriage of Frederick* (1991), 218 Ill. App. 3d 533, 544, 578 N.E.2d 612, 621.

Carl argues the dissolution judgment awarded him an inequitably small portion of the parties' marital assets and an inequitably large portion of the parties' marital debts. The major asset was the marital residence worth approximately $44,000, which was awarded to Ruth. The rest of the assets were essentially equally divided. Ruth was assigned the bulk of the marital debt in the form of the $16,926.31 home mortgage. Carl was left with approximately $11,000 in credit card debts, much of which was incurred by Carl for his own purposes after the parties separated. At the hearing Carl could not account for his use of the credit cards by statements or receipts.

The relevant factors in dividing marital property include (1) "the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties" (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(7)); and (2) "the reasonable opportunity of each spouse for future acquisition of capital assets and income" (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(10)). Here, it is undisputed that Ruth was a "homemaker" who stayed at home and reared the parties' two children, did the laundry, cooked the meals, ran errands, and cleaned the house. During the parties' 30-year marriage Ruth never had a full-time job and did not make more than $2,500 in any year. As for education, she finished only the eighth grade and had little job training during the marriage. Additionally, Ruth, who was 50 years old at the time of the hearing, testified she had various physical limitations and medical problems including high blood pressure and high cholesterol for which she took medication. She also testified she took medication for chest pains and had been treated by a chiropractor for back pain. At the time of the hearing she wore an orthopedic shoe because of foot surgery for a plantar neuroma. Carl, who was 55 years old at the time of the hearing, worked as a store manager for EMRO Marketing, a company for which he had worked for 23 years, and held the elected office of Casey Township supervisor. His total gross income for 1991 was almost $37,000.

■ In light of various relevant statutory factors including Ruth's poor health, late entry into the job market, lack of education and job skills, and overall limited opportunity for substantial income, we cannot say the division of property awarding Ruth the marital home along with the mortgage liability was an abuse of discretion. See *In re Marriage of Pahlke* (1987), 154 Ill. App. 3d 256, 262, 507 N.E.2d

71, 75-76 (trial court properly awarded ex-wife greater portion of marital assets where ex-husband had 18-year history of earnings while ex-wife had only recent employment history and a history of mental illness); see *In re Marriage of Smith* (1979), 77 Ill. App. 3d 858, 864, 396 N.E.2d 859, 864 (where ex-wife was age 54, had a lack of job skills, and, during 34 years of marriage, served mainly as a home-maker, and ex-husband had worked full-time during the marriage, it was an abuse of discretion for the trial court to equally divide the equity in the marital home).

Next, Carl argues the trial court's award of temporary mainte-nance to Ruth in the amount of $950 per month was improper. An award of maintenance is within the discretion of the trial court and should not be reversed unless it constitutes an abuse of discretion or is against the manifest weight of the evidence. (*In re Marriage of Kerber* (1991), 215 Ill. App. 3d 248, 252, 574 N.E.2d 830, 832-33.) An award of maintenance is warranted when the trial court finds the spouse seeking maintenance (1) lacks sufficient property to provide for reasonable needs and (2) is unable to support himself, or (3) is oth-erwise without sufficient income. (Ill. Rev. Stat. 1991, ch. 40, par. 504(a).) The maintenance order shall be in "such amounts and for such periods of time as the court deems just" after consideration of all relevant factors, including (1) the financial resources of the party seeking maintenance, including his or her marital property; (2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment; (3) the standard of living established during the marriage; (4) the dura-tion of the marriage; (5) the age and physical and emotional condition of each of the parties; (6) the ability of the spouse paying maintenance to meet his needs while meeting those of the spouse seeking mainte-nance; and (7) the tax consequences of the property division. Ill. Rev. Stat. 1991, ch. 40, par. 504(b); *Kerber*, 215 Ill. App. 3d at 253, 574 N.E.2d at 833.

█ Here, there is no question that Ruth lacked sufficient prop-erty and income to support herself. Furthermore, with only an eighth-grade education and a very limited employment history, the trial court properly concluded that Ruth would have some difficulty in securing appropriate employment. Likewise, Ruth's age (50) and poor physical condition also support a maintenance award. Ruth's expenses, which include $300 per month for house payment, $67.66 per month in taxes and insurance on the house, $237 per month for utilities, $200 per month in medical expenses, and $260 for food, exceed the $950-per-month maintenance. In contrast, in 1991, Carl had a gross income of

nearly $37,000. He had worked for EMRO for 23 years and nothing in the record suggests any significant dimunition in his earning potential. Based on his 1991 tax form Carl has a net income of approximately $2,370 per month. After his $950 maintenance payment to Ruth, Carl will still have over $1,400 per month, which is sufficient to cover his own expenses. We cannot say the trial court's maintenance award was an abuse of discretion.

■ Next, Carl argues the trial court's requirement that he keep Ruth as a beneficiary on his life insurance policy until further order of the court is improper. Carl cites *Hogan v. Hogan* (1978), 58 Ill. App. 3d 661, 374 N.E.2d 1040, for the proposition that the court must find him untrustworthy before it can require that maintenance be secured with life insurance, but *Hogan* relied on a specific provision in the prior divorce act (Ill. Rev. Stat. 1975, ch. 40, par. 19) which is no longer found in the present Act. A spouse receiving maintenance may logically desire insurance on the payor's life whether he is untrustworthy or not.

Carl has not argued that our decision in *In re Marriage of Clarke* (1984), 125 Ill. App. 3d 432, 465 N.E.2d 975, requires reversal. In *Clarke*, we held that a court has no authority to require security for the payment of maintenance after the death of the obligor, and that insurance on the life of the obligor would amount to such security. We decline to address the application of *Clarke* to this case in the absence of briefs and arguments by the parties. We do reject any implication in *Clarke* that such an order is a void order which may be attacked at any time, or that the erroneous entry of such an order may not be waived. Because of the disastrous consequences which follow when orders and judgments are allowed to be collaterally attacked, orders should be characterized as void only when no other alternative is possible. We reject the notion that with statutory proceedings any failure to comply with the statute is an action outside the subject-matter jurisdiction of the court. (*In re Custody of Sexton* (1981), 84 Ill. 2d 312, 319-22, 418 N.E.2d 729, 732-34 (failure to file affidavits required by statute does not deprive court of subject-matter jurisdiction).) Only where the legislature may be said to have intended a particular requirement to serve as a limitation on the authority of the court to act should such a limitation be imposed. (*In re Marriage of Bussey* (1984), 128 Ill. App. 3d 730, 733, 471 N.E.2d 563, 565 (question whether there were "statutory conditions precedent"), *aff'd* (1985), 108 Ill. 2d 286, 294, 483 N.E.2d 1229, 1232-33.) For example, the 90-day residence requirement of section 401(a) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 401(a)) is a statutory condition precedent. *In re Marriage*

*of Parks* (1984), 122 Ill. App. 3d 905, 909-10, 461 N.E.2d 681, 684; see also *Skilling v. Skilling* (1982), 104 Ill. App. 3d 213, 219, 432 N.E.2d 881, 886.

It could be argued that *Clarke*, which relied on the statutory provision that the obligation to pay future maintenance is terminated by the death of a party (Ill. Rev. Stat. 1983, ch. 40, par. 510(b)), was wrongly decided, in light of the Act's direction that it be liberally construed to make reasonable provision for spouses and minor children. (Ill. Rev. Stat. 1983, ch. 40, par. 102(5).) Section 510(b) prohibits maintenance payments after an obligor's death, not payments during an obligor's life which have some effect after his death. If a court awards a large amount of property instead of maintenance, as the court is encouraged to do under the Act, that property will be available to the obligee even after the obligor's death. Similarly, an obligee could certainly choose to purchase insurance on the obligor's life, and could use the obligor's maintenance payments to pay the premiums (assuming the obligee had an insurable interest). (See *Meehan v. Transamerica Occidental Life Insurance Co.* (1986), 148 Ill. App. 3d 477, 499 N.E.2d 602.) Section 510(b) deals with the time during which maintenance payments may be made, not with what maintenance payments may be used for.

*Clarke* also relied on the fact that the prior divorce act specifically allowed the court to require security, and that specific authorization was not contained in the act. The Act is not simply a revision of Illinois law, however, but a uniform act, and it may be inappropriate to give much weight to the fact that the uniform act does not contain specific provisions found in the earlier Illinois statute. It is true that the Act specifically authorizes a court to set aside property in a trust for children (Ill. Rev. Stat. 1983, ch. 40, par. 503(g)), but it is difficult to read that specific authorization as a legislative prohibition of orders requiring a maintenance obligor to maintain insurance on his life to prevent the premature termination of maintenance.

Next, Carl argues the trial court's distribution of his pension retirement asset failed to limit Ruth's rights to the marital portion of the pension rights. The trial court awarded Ruth one-half of Carl's pension benefits through his employment with ERMO "if, as and when those pension benefits are to be paid to him." Carl had contributed to the plan for 23 years and was married during all of those years. Apparently under this order if Carl terminated his contributions to the plan as of the date of dissolution Ruth would receive only one-half of the marital portion of the plan (the portion due to contributions during the marriage). However, if Carl continued to make con-

tributions after the dissolution until such time as his post-dissolution contributions equalled his predissolution contributions, Ruth would still receive one-half of the total benefits, but that would be all of the marital portion of the benefits. No reason appears why the trial court would want to award Ruth a percentage of pension benefits increasing from 50% at the time of dissolution to 100% over the succeeding years. Most orders of this type first provide some method of calculating the marital portion of the pension benefit, and then award the parties a percentage of that marital portion which will remain fairly constant as the years go by. For example, Ruth suggests that if we find the language employed by the trial court to be ambiguous we should use the following formula:

> "Fifty percent (50%) times (X) a fraction which has the numerator of 278 months (no. of months the pension accrued during marriage) and a denominator of the number of total months the pension accrued (278/total no. of months pension accrued) times (X) the monthly pension payments made to Carl Vernon upon retirement."

Carl objects to the trial court's order because it fails to limit Ruth's award to one-half of the value of the marital portion of his pension rights. The trial court had the power, however, to award to Ruth the entire marital portion of the pension rights, the entire value of the pension at the time of the dissolution of marriage. It seems highly unlikely Ruth would ever receive any benefits attributable to Carl's nonmarital contributions. It is possible Carl's periodic contributions in future years will be larger than those in past years, but the past contributions have been producing income for many years and will continue to do so in the future. At any rate, Carl may insure that Ruth not receive the benefit of any of his nonmarital contributions by terminating his contributions to the plan.

However, because we have some uncertainty whether the trial court intended that Ruth receive something more than 50% of the marital portion of the pension benefits, we remand so that that determination can be made. If the trial court decides that Ruth should receive only 50% of the marital portion of the pension benefits language similar to that suggested by Ruth should be used. Even better, it may be possible for the plan administrator to segregate the portion of the account belonging to Ruth from the portion belonging to Carl. A qualified domestic relation order (QDRO) plan administrator has 18 months within which to determine whether an order meets QDRO requirements. (26 U.S.C. §§414(p)(7)(B), (p)(7)(C), (p)(7)(D) (Supp. IV 1986).) During that time the plan administrator must separately ac-

count for the amounts payable to the alternate payee. 26 U.S.C. §414(p)(7)(A) (Supp. IV 1986); see Massler, *Qualified Domestic Relations Orders: A Statutory Analysis*, 19 Seton Hall L. Rev. 224 (1989).

Affirmed and remanded.

STEIGMANN, P.J., concurs.

JUSTICE LUND, concurring in part and dissenting in part:
My concern is with the provision requiring petitioner to maintain respondent as beneficiary on an insurance policy maintained on his life. There does not appear to be a reason to believe petitioner will not pay maintenance as required.

Perhaps there is good argument for requiring provision of life insurance benefits for an ex-spouse. However, the legislature has determined that maintenance terminates (absent an agreement to the contrary) on the death of the payor ex-spouse (see section 510(c) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 510(c))). In light of section 510(c) and property division requirements of section 503 of the Act, I find a court order providing life insurance benefits to an ex-spouse absent such agreement is inconsistent with legislative intent.

Are life insurance policies property? Are they marital property? If purchased and paid for during the marriage, odds are they were purchased with marital income. Those policies with cash-accumulated cash values are certainly property interests. Those without accumulated cash values, but with a straight life premium, must have a value based upon the face amount of the policy and the life expectancy of the insured. If they are marital property, then why are they not subject to section 503 distribution? The answer is, of course, they are.

It appears we have an award of the policy to the insured but the main benefit, at least for the time being, is awarded to the ex-spouse. Is this a new creature of section 503, namely a contingent distribution of an asset, or perhaps a reviewable distribution of an asset?

Now, who pays the premium? In this case, evidently the insured. Are the premiums to be considered additional maintenance, thus deductible on petitioner's tax return and shown as taxable income on respondent's return? What if the court, at some time in the future, decides to allow petitioner the right to change beneficiaries?

I have no problem with the decision in *Clarke*. If maintenance is not paid as ordered, security such as life insurance may be proper. I find no reason why any part of *Clarke* should be overruled.

Until there is legislative action providing otherwise, I would require ownership of life insurance policies to be determined by provisions of section 503 of the Act. If the ex-spouse beneficiary is awarded ownership, then that spouse has the premium responsibility. If the insured is awarded the policy, then he or she can name the beneficiary of choice, pledge the policy, or let it lapse—all being subject to the possible requirement that the policy is ordered as security, as in *Clarke.*

In essence, the trial court's order is providing that a portion of petitioner's property will go to respondent upon his death. This appears to be an order for maintenance after death. Perhaps it is time for those in domestic relations to carefully examine the life insurance questions.