641 A.2d 535

EDMUND E. JACOBITTI, PLAINTIFF-APPELLANT, v. STELLA
MARIA JACOBITTI, DEFENDANT-RESPONDENT.

Argued February 1, 1994—Decided June 6, 1994.

*Albert L. Cohn* argued the cause for appellant (*Cohn, Lifland, Pearlman, Herrmann & Knopf,* attorneys; *Mr. Cohn* and *Terri Del Greco,* of counsel, and on the briefs).

*Gail J. Mitchell* argued the cause for respondent (*Schwartz & Barkin,* attorneys; *Ms. Mitchell* and *Allen J. Barkin,* on the briefs).

The opinion of the Court was delivered by

GARIBALDI, J.

*N.J.S.A.* 2A:34–25 provides that "[a]limony shall terminate on the death of the payer spouse." In this case a trial court ordered a divorced man to create a trust fund from which monthly alimony payments would be made to his ex-wife so long as *she* lives, even if she outlives her ex-husband. The court did so by invoking another part of *N.J.S.A.* 2A:34–25, which provides that a court may order a spouse to maintain life insurance to protect the former spouse "in the event of the payer spouse's death." Plaintiff, Edmund E. Jacobitti, asserts that the court was statutorily barred from ordering the creation of the trust. We hold that under the specific facts of this case, it was not.

I

Edmund and Stella Marie Jacobitti were married in 1975 and divorced in early 1991. At trial, Edmund, a retired physician, was in apparent good health despite his eighty-seven years. Stella, nineteen years younger than Edmund, however, was confined to a wheelchair due to the debilitating effects of multiple sclerosis.

Although Edmund's precise net worth is not known, he is unquestionably wealthy. In an ante-nuptial agreement executed in 1975, Edmund represented that he had assets in excess of $1,325,000 and an annual income in excess of $100,000. The trial court, however, determined that when the agreement had been executed, Edmund had failed to make complete disclosure of his net worth; it therefore found the ante-nuptial agreement to be unconscionable and unenforceable. Stella asserts that at the time of the trial, Edmund was worth six- to nine-million dollars and had an annual income in excess of $300,000. To avoid disclosure of his wealth at trial, Edmund's counsel stipulated that Edmund had the "capacity financially to make any payment for support or alimony that the court may reasonably fix."

Stella, on the other hand, is impecunious. Her physical condition is progressively deteriorating. Except for the $75,000 she

received in equitable distribution, Stella is totally dependent on the alimony that she will receive from Edmund.

The trial court found that Stella was entitled to $4,200 per month in alimony. Finding that it had statutory authority "to create trusts in circumstances where there is no certainty that the breadwinner will continue to be able to make payments for a period of time into the future," the court ordered Edmund to place $500,000 in trust to cover all the income to be paid to Stella each month. On Stella's death, the corpus would be distributed to Edmund, his estate, or a designated charity. The court provided, however, that the corpus could be invaded to pay Stella's monthly health-care expenses that exceeded $1,000.

Because of Edmund's advanced age, the trial court ordered Edmund to create the trust rather than ordering Edmund to purchase a life-insurance policy naming Stella as the beneficiary. As the Appellate Division noted, the then-eighty-seven-year old Edmund was "undoubtedly too old to obtain life insurance to secure continuation of defendant's alimony payments after death." Thus, the trust was a more effective alternative.

Edmund appealed the order to create the trust, alleging that it required him to pay alimony after his death, which is expressly prohibited under *N.J.S.A.* 2A:34-25. The Appellate Division affirmed the creation of the trust, but remanded to the trial court to amend the order to establish a trust "sufficiently funded" to secure monthly payments of $4,200 to Stella for as long as she lives. 263 *N.J.Super.* 608, 615, 623 *A.*2d 794, 798 (1993). It further provided that unless Edmund agreed otherwise, on Stella's death the trust proceeds would revert to him, his heirs, or other legal designees, but not to charity. *Id.* at 617, 623 *A.*2d at 798.

Both parties petitioned for certification. We granted only Edmund's petition, 134 *N.J.* 481, 634 *A.*2d 528 (1993), limited to the "issue of the validity of the alimony-payment trust."

■  We now hold that under the unique circumstances of this case, Jacobitti's trust is the appropriate equitable remedy to fulfill

the Legislature's intent in authorizing life insurance for the protection of a dependent spouse "in the event of the payer spouse's death." *See N.J.S.A.* 2A:34–25.

## II

■ Alimony is an allowance for support and maintenance that, traditionally, a "husband is required to supply to his wife when she is living separate and apart or has been divorced from him." *Davis v. Davis,* 184 *N.J.Super.* 430, 436, 446 *A.*2d 540, 544 (App.Div.1982). Certainly the traditional roles of husband as bread-winner and wife as dependent no longer apply in every divorce situation, but they do apply to the Jacobittis. The supporting party pays alimony in substitution for the duty of marital support. *Ibid.*

■ In New Jersey, courts enter alimony orders pursuant to *N.J.S.A.* 2A:34–23, which before the 1988 amendments provided in pertinent part:

The court may make such order as to the alimony or maintenance of the parties, and also as to the care, custody, education and maintenance of the children, or any of them, as the circumstances of the parties and the nature of the case shall render fit, reasonable and just, and require reasonable security for the due observance of such orders.

By authorizing a court to order alimony whenever "fit, reasonable and just," and to require reasonable security for the enforcement of those orders, the Legislature gave courts substantial discretion in determining whether to grant alimony and in setting the amount and form in which to grant it. *Carr v. Carr,* 120 *N.J.* 336, 351, 576 *A.*2d 872, 879 (1990). Courts are to apply the "comprehensive" terms of *N.J.S.A.* 2A:34–23 liberally and equitably. *Grotsky v. Grotsky,* 58 *N.J.* 354, 361, 277 *A.*2d 535, 540 (1971).

■ The obligation to provide alimony support and maintenance is personal to the paying spouse, and at common law the paying spouse's obligation terminated on the death of either spouse. *Ibid.;* L.I. Reiser, Annotation, *Death of Husband as Affecting Alimony,* 39 *A.L.R.*2d 1406 (1955). That principle—that alimony ended at the death of the payor—was reflected in *Modell*

*v. Modell,* 23 *N.J.Super.* 60, 92 *A.*2d 505 (1952). There, the Appellate Division reviewed a decision by the trial court that forced the paying spouse "to create a fund for the support and maintenance" of the dependent spouse in case the paying spouse died first. *Id.* at 62, 92 *A.*2d at 506. Specifically, the order required the paying spouse to make the dependent spouse a beneficiary of a life-insurance policy. *Ibid.* The Appellate Division, in one brief paragraph, held that the trial court had erred in entering its order because "[t]he death of either the husband or the wife terminates the husband's obligation to support the wife." *Ibid.*

*Modell,* however, has been whittled away by subsequent case law. In *Capodanno v. Capodanno,* 58 *N.J.* 113, 275 *A.*2d 441 (1971); *Khalaf v. Khalaf,* 58 *N.J.* 63, 275 *A.*2d 132 (1971); and *Martindell v. Martindell,* 21 *N.J.* 341, 122 *A.*2d 352 (1956), the Court held that courts may make alimony orders in amounts large enough to enable a dependent spouse to accumulate savings on which to draw income should the paying spouse predecease the dependent spouse. Those allowances were made so that the dependent spouse might "protect herself against the day when alimony payments may cease." *Khalaf, supra,* 58 *N.J.* at 70, 275 *A.*2d at 136.

In *Grotsky, supra,* 58 *N.J.* at 361, 277 *A.*2d at 539, we further eroded the common-law *Modell* approach. The *Grotsky* Court upheld an order under *N.J.S.A.* 2A:34–23 that directed the father to maintain his life insurance and name his minor children as beneficiaries, "for the purpose of securing due fulfillment of the support order during their minority." *Id.* at 361, 277 *A.*2d at 540. Later, the Court relied on *Grotsky* in *Meerwarth v. Meerwarth,* 71 *N.J.* 541, 366 *A.*2d 979 (1976), to "conclude that a trial court, in appropriate circumstances and for good cause shown, could order a [paying spouse] to cooperate in obtaining [life] insurance . . . for the financial protection of [the dependent spouse and any children]. . . ." *Id.* at 544, 366 *A.*2d at 980. The Court cited *N.J.S.A.* 2A:34–23 as the source of that equitable power in direct contradiction to *Modell, supra.* But the Court ultimately held that the

trial court had correctly declined to order the paying spouse to submit to the physical examination required to obtain a life-insurance policy because the supporting spouse's privacy interest outweighed the interest in protecting the dependent spouse. *Ibid.*

Finally, in 1982, the Appellate Division decided *Davis, supra,* 184 *N.J.Super.* 430, 446 *A.*2d 540, a case strikingly similar to the instant matter. Mrs. Davis was legally blind due to progressive degenerative retinitis pigmentosa and also suffered from advanced arteriosclerosis. She did not receive a distributive share of the marital assets in the divorce; she was unable to work; and except for a small amount of her own investment income, she was completely dependent on her alimony. *Ibid.* Mr. Davis, however, had substantial assets and income that could easily provide for the continuation of his alimony payments should he predecease Mrs. Davis. *Ibid.*

The Appellate Division held that in the unique circumstances of the Davises' case, "equity crie[d] out for some relief." Therefore, the trial court's requirement that Mr. Davis obtain life insurance "or create a trust fund to guarantee future alimony payments" was appropriate and "plainly within the broad authority" of *N.J.S.A.* 2A:34–23. *Ibid.* With regard to *Modell, supra,* the Appellate Division stated that "its viability had been undercut by later Supreme Court decisions" and that it relied on the application of the equitable power of the courts recognized in those cases to enter its decision. *Id.* at 437, 439, 446 *A.*2d at 544, 545.

### III

In the face of the contradictory decisions on the propriety of ordering a supporting spouse to purchase life insurance or to create a trust to maintain alimony payments to the dependent spouse after the supporting spouse's death, the Legislature amended *N.J.S.A.* 2A:34–25. *L.* 1988, *c.* 153, § 7. That amendment added the following language to the statute:

> *Alimony shall terminate upon the death of the payer spouse,* except that any arrearages that have accrued prior to the date of the payer spouse's death shall not be vacated or annulled.
>
> Nothing in this act shall be construed to prohibit a court from ordering either spouse to *maintain life insurance for the protection of the former spouse or the children of the marriage in the event of the payer spouse's death.*

[Emphasis added.]

The legislative history of that amendment is non-existent except for the following comment from the Senate Judiciary Committee Statement to Senate Bill No. 976, which reiterates that the amendment "[p]rovides that the court may order a spouse to maintain life insurance for the protection of the former spouse or any children." Senate Judiciary Committee, *Statement to Senate Bill No. 976* 3 (1988).

The plain language of that amendment indicates that the Legislature intended to do two somewhat incongruous things. First, the Legislature codified the principle relied on by the *Modell* court that a supporting spouse's alimony obligations terminate on the death of that spouse. Second, the Legislature rejected the result in *Modell* and codified at least a portion of *Davis* by explicitly allowing a court to order the supporting spouse to maintain life insurance for the benefit of the dependent spouse to protect the dependent spouse if the dependent spouse outlives the supporting spouse.

Although the *Davis* court had also explicitly sanctioned the use of trust funds to support the dependent spouse after the supporting spouse's death, the Legislature did not specifically sanction their use in its 1988 amendment. The Legislature did, however, explicitly sanction the use of trust funds in another context. In 1988, the Legislature amended *N.J.S.A.* 2A:34–23 so that the provision now reads:

> the court may make such order as to the alimony or maintenance of the parties, and also as to the care, custody, education and maintenance of the children, or any of them, as the circumstances of the parties and the nature of the case shall render fit, reasonable and just, and require reasonable security for the due observance of such orders, *including, but not limited to, the creation of trusts or other security*

*devices, to assure payment of reasonably foreseeable medical and educational expenses.*

[*L.*1988, *c.* 153, § 3 (emphasis added).]

That amendment explicitly sanctions the use of trust funds for the limited purpose of securing the payment of medical and educational expenses. However, it does not authorize a court to order the creation of a trust fund to provide support after the supporting spouse dies.

Neither of the two relevant 1988 amendments addresses the issue in this case: whether a court may order the supporting spouse to create a trust fund that would support the dependent spouse after the death of the paying spouse. Plaintiff argues, first, that the trust constitutes post-mortem alimony, which is prohibited under *N.J.S.A.* 2A:34–25, and, second, that the Legislature enacted the second paragraph of that provision to provide for the payment of only accumulated alimony arrearages due at the death of the payer spouse. Defendant argues that the trust does not constitute post-mortem alimony because it will be fully funded prior to Edmund's death and that Edmund's "arrearages" argument makes no sense. We do not decide this case on the resolution of either of those issues.

Instead, we rely on the legislative intent expressed in the 1988 amendments to *N.J.S.A.* 2A:34–23 and *N.J.S.A.* 2A:34–25. We agree with Edmund Jacobitti that if the Legislature had wanted to include alimony-payment trusts in the life-insurance exception to *N.J.S.A.* 2A:34–25, it could easily have done so. Nonetheless, the Legislature in both its 1988 amendments to *N.J.S.A.* 2A:34–23 and *N.J.S.A.* 2A:34–25 expressed its interest in protecting former spouses. We find that interest to be the predominant public policy underlying the Legislature's 1988 amendments.

"Generally, a court's duty in construing a statute is to determine the intent of the Legislature." *AMN, Inc. v. Township of S. Brunswick Rent Levelling Bd.,* 93 *N.J.* 518, 525, 461 *A.*2d 1138, 1141 (1983). In construing a statute, a court should " 'effectuate the legislative intent in light of the language used and the

*objectives sought to be achieved.'"   Merin v. Maglaki,* 126 *N.J.*
430, 435, 599 *A.*2d 1256, 1259 (1992) (quoting *State v. Maguire,* 84
*N.J.* 508, 514, 423 *A.*2d 294, 297 (1980)) (emphasis supplied).   An
examination of the objectives of the 1988 amendments indicates
that the Legislature did not intend to prohibit courts from order-
ing supporting spouses to create trust funds to protect dependent
spouses when the supporting spouses die.

The Legislature indicated that that support could not take the
form of alimony payments after the death of the payer spouse.
Nevertheless, the Legislature indicated with equal clarity that a
court could provide for the support of the dependent spouse after
the death of the supporting spouse by ordering the supporting
spouse to name the dependent spouse as the beneficiary of a life-
insurance policy.

The most plausible intention to ascribe to the Legislature in the
event of an *uninsurable* supporting spouse is to allow a court to
order such a spouse to create a trust to protect the dependent
spouse in the event of that spouse's death.   That device would
achieve the same protection for a dependent spouse as an order
requiring an insurable supporting spouse to maintain life insur-
ance for the benefit of the former spouse.

The creation of trusts certainly is not unprecedented in the
context of family law.   *N.J.S.A.* 2A:34–23 provides that the court
may require reasonable security for the due observance of alimo-
ny, including the creation of trusts to assure payment of reason-
ably-foreseeable medical and educational expenses.   That the trial
court could have ordered Edmund to create a trust to assure
during his lifetime the payment of Stella's very foreseeable medi-
cal expenses is therefore undisputed.   Similarly, the court could
have ordered Edmund to maintain life insurance to protect Stella
from becoming a public charge in the event that Edmund were to
predecease her.   The lower court's failure to follow *N.J.S.A.*
2A:34–25 to the letter is not fatal to the trial court's order that
Edmund create the trust.

Stella is one of the persons that the Legislature intended to protect. However, life insurance for the now-*ninety*-year-old Edmund, if available at all, would carry such a high premium that it is virtually not an option. A self-insuring alimony payment trust is the only reasonable solution for the Jacobittis.

This case is analogous to *Carr, supra,* 120 *N.J.* 336, 576 *A.*2d 872. Mrs. Carr was caught between two statutes, inasmuch as the lower courts concluded that she was entitled to neither a statutory equitable distribution under the divorce laws nor a statutory elective share under the probate code. *Id.* at 340, 576 *A.*2d at 874. She was in the process of divorcing her husband when he died. The court found that she was barred from receiving equitable distribution of the marital assets because the divorce proceeding abated on the death of her husband. However, because the Carrs were not living together as husband and wife, she was not entitled to a surviving spouse's statutory elective-share of her deceased husband's estate. *Id.* at 345–46, 576 *A.*2d at 876–77.

In *Carr* we recognized the strong public policy that marital assets are the joint property of both spouses. We searched the statutory scheme for any firm indication that the Legislature had expressed a contrary intention. Finding none, we exercised our equitable power by imposing a constructive trust that "effectuat[ed] sound public policy and mold[ed] the law to embody the societal values that are exemplified by such public policy." *Id.* at 350, 576 *A.*2d at 879. That constructive trust prevented Mrs. Carr from forfeiting what was legitimately hers.

Here, too, the Court should properly exercise its equitable power to protect Stella from the insurance problem caused by her former husband's advanced age. Stella's total dependency on Edmund's alimony payments and her progressively-debilitating physical condition emphasize the need that some relief be fashioned to protect her if Edmund predeceases her. But for her husband's advanced age, a court could have ordered the purchase of life insurance, which is specifically permitted under *N.J.S.A.* 2A:34-25, to secure her rights.

### IV

Our decision today affords her that protection, but only because of the fact that Edmund is too old to obtain life insurance. The trust fund in this case therefore replaces the statutory exception for life insurance because the need for protection is great and life insurance is unavailable. This case presents us with a classic example of what the Legislature sought to avoid when it enacted the life insurance statute: an ex-spouse who would be penniless but for alimony. In its perceptive assessment of the facts and its order of the creation of the trust, the trial court eliminated the otherwise-certain outcome that the dependent ex-spouse would become a public charge. To eradicate that turn of events, the trial court properly ordered the creation of the trust for the purpose of continuing alimony payments for the life of the dependent spouse in the event that he predeceases her.

We affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—none.