Filed 11/26/08          NO. 4-07-0730

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: the Marriage of | ) | Appeal from |
| BARBARA G. WALKER, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Adams County |
| and | ) | No. 06D192 |
| DAVID P. WALKER, | ) | |
| Respondent-Appellant. | ) | Honorable |
| | ) | Mark A. Drummond, |
| | ) | Judge Presiding. |

_____

JUSTICE MYERSCOUGH delivered the opinion of the court:

Petitioner, Barbara G. Walker, filed a petition for dissolution of marriage in August 2006 from respondent, David P. Walker. In April 2007, the trial court entered the judgment for dissolution of marriage and its order on the remaining issues.

On appeal, David argues the trial court erred in (1) its findings of his net income, (2) the division of marital property, (3) its award of permanent maintenance to Barbara, and (4) requiring David to maintain a life-insurance policy to secure the maintenance payments. We affirm.

I. BACKGROUND

Barbara and David were married on January 26, 1981. The parties had two children during the marriage, Christopher and Stacey, both of whom are adults. The parties separated in 2002. In August 2006, Barbara filed a petition for dissolution of marriage.

In March 2007, the trial court conducted a hearing on the petition for dissolution and related issues. Barbara testified she was 52 years old and worked as a teacher in the Quincy public school system. Her net income amounted to approximately $2,500 per month. She stated David made in excess of $200,000 per year gross salary. Barbara claimed $3,562.09 in monthly expenses, which included the mortgage. The marital residence was appraised at $221,000 with an outstanding mortgage of $132,892.99. Barbara testified she had lived in the home for 11 years and she had no desire to sell it because she loved the community and was "very comfortable" in the home. David made the monthly mortgage payments of $814 plus $325 in taxes.

Barbara testified she had a retirement fund with the Teacher's Retirement System of the State of Illinois, which would pay her between $800 and $1,300 if she chose to retire. At retirement, she would have to choose between the fund or social security. She requested maintenance based on the 26-year marriage as well as $3,800 in attorney fees.

On cross-examination, Barbara testified she did not know David's $204,000 gross income included an $81,000 bonus in 2006 for performance in 2005. She testified she had nonmarital stocks valued at approximately $14,360. Barbara also worked as an adjunct professor at Quincy University and received $3,200 in gross income per year.

David, age 50, testified he lived in Andover, Massachusetts, and worked as vice president of engineering for Microwave Radio Communications.  He stated his "salary structure is $135,000 base plus a performance bonus of 30[%]."  His net pay per month was $7,515.09.  He received an $81,000 bonus in March 2006.  He did not expect to receive a bonus "to that degree" in the future.  His 2007 bonus amounted to $40,000.

David stated he was agreeable to a 60/40 split in favor of Barbara.  He was also willing to pay maintenance of $1,025 per month for two years.  David had a life-insurance policy through his employment with Barbara as the beneficiary.

In April 2007, the trial court issued the judgment for dissolution of marriage.  In the division of property, the court awarded each party his or her personal property.  The court awarded the marital residence to Barbara.  She also received her interest in her retirement plan ($30,691) and the bank accounts ($5,010).  David received his VISLINK 401K plan ($26,400), his Glenayre retirement savings plan ($31,820), his Fidelity individual retirement account ($29,159), and his interest in the Bank of America account ($23,700).  The distribution amounted to approximately $104,644 to David and $155,279 to Barbara.  The court ordered David to pay Barbara $10,000 representing the 60/40 split of marital assets between the parties.

The trial court also ordered David to pay $2,000 per

month in maintenance for the months of April and May 2007, as he continued to pay for Stacey's college expenses. In June 2007, the court ordered David to pay $3,000 per month through May 2014. Because Barbara will receive between $800 and $1,300 from her retirement fund beginning in May 2014, the court required David to pay only $1,640 per month thereafter. Also, the court required David to maintain life insurance naming Barbara as sole beneficiary. The award of maintenance was subject to modification based on a change in circumstances.

The trial court made specific findings in open court pertinent to this appeal:

"THE COURT: Okay. The court's considered the evidence and the arguments and applies the statutory considerations with regard to maintenance and property division.

The court will do a variation of the 60/40 split. The court awards her all of her nonmarital property as set forth in her pretrial memorandum and notes there is approximately $14,000 in stock in addition to some personal items in the--in her list.

Each party is awarded their personal property currently held in their possession, and the court is awarding the distribution as

- 4 -

set forth on the [r]espondent's proposed distribution with this proviso, and that is I read down the numbers and taking the value of the--to the husband of the Chevy at [$]409, the Fidelity IRA I don't believe is [$]30,69-1, I believe that is [$]29,159.  I have added [$]5,300 onto the Vislink 401K and rounded that off at $26,400.  Glenayre at [$]31,820.

I am awarding him the household items he's requested, which amount to, the court finds, at $140, so I am lowering the household items from [$]1,150 on his side down to [$]140 and, accordingly, increasing hers on the other side by that difference, and the account of the Bank of America at [$]16,016. I am adding in the kayak of [$]700.  I come to a total of [$]104,644.

She is awarded those items that are listed on her side of the ledger.  I have increased the household items to [$]7,420, and what I am going to order is on the payout from [r]espondent, instead of [$]7,450, I am rounding that off to an even $10,000.  If I would go to strictly 60/40 with no fractions,

- 5 -

it would be [$]1,694, but I am taking into account the attorney[] fees she's having to pay. So it's 60/40, some odd percentage. I'm not exactly sure what it is, but I don't think it's even a full percent. So we need to increase payout from [r]espondent by $2,550.

Each party will pay their own attorney[] fees, and with the maintenance award the court finds that she can pay her attorney[] fees.

Sara graduates in May. Am I correct on that?

[PETITIONER'S ATTORNEY]: Yes.

[RESPONDENT]: Stacey, Your Honor. But yes.

THE COURT: Stacey. I'm sorry. I don't know where I got Sara.

The husband certainly has not been mi- serly with regard to maintenance. He was at $800 per week, which results in a payment of $3,466 per month. That was then lowered to [$]385 per week plus paying the mortgage, so that lowered it to $2,873. However, at

trial[,] the husband's position is a position that I cannot accept under the case law. When you have got a marriage of 26 years with this disparity in income, I don't know of any case where we have this value of property distribution, even in a 60/40 split, that would limit maintenance to [two] years at this amount. There is simply too great a disparity in income. There's not enough assets to provide her security, and the court notes that she has submitted what is essentially a bare[-]bones budget. The court notes that the husband is putting away a thousand--nearly $1,000 a month in the 401K, and she certainly ought to have funds suffi-cient for her to live on, and in addition, enjoy the life[]style to which the parties had become accustomed.

The court is going to vary the mainte-nance, though, based upon several contingen-cies. First of all, the husband has and did not put the wife to the time and expense of filing a post-18 educational support case, which is to his credit. Therefore, the main-

tenance amount--

Has March been paid, the mortgage and all of that?

[PETITIONER'S ATTORNEY]:  I don't know.

[RESPONDENT]:  That's correct.

THE COURT:  So, for the months of April and May, the maintenance amount is going to be $2,000 for those [two] months, because he's paying for the daughter's education.  It will go up to $3,000 per month and that will be through the month of May of the year 2014. The reason I pick that date is on her [e]xhibit G that is her, [']retirement date.[']  That is [seven] years of maintenance at $3,000 per month.

At that date, beginning with the June payment, I am lowering it by the amount that she should or could receive of [$]1,360.  So his maintenance payment will lower to $1,640 per month.  During the time period that he is paying maintenance[,] he is to maintain her as a beneficiary on his insurance policy, providing proof of that to her every year.

My biggest concern about maintenance is,

ma'am, if I were to award you the maintenance and he would, unfortunately, walk out here and get hit by a car, the maintenance is gone, because it ends upon his death.  So, the court attempts in maintenance awards, instead of just setting it flat out, that I want to set up various contingencies.  So we have the [$]2,000 for [two] months, goes up to [$]3,000, and then we have a lowering of it in the year 2014 when she becomes eligible for her retirement.

In addition, it is secured by the life insurance.  In the event he should lose his job and that life insurance is gone, then I think this court or the parties should do the following: I still want her maintenance payments secured by life insurance, but if he has to go out into the market and purchase life insurance, then the monthly maintenance amount should be lowered by the amount that he has to pay for insurance to secure her maintenance payments, and for example, if he's paying $36,000 per year and an insurance policy costs him $2,000, well, let's make it

easy, $2,400 per year, then the maintenance should probably, in my opinion, be lowered by the $200 per month he's paying for that life[-]insurance policy.

The disparity in income at this point is simply too large for me to limit maintenance to [two] years, and I can't right off the top of my head think of a maintenance case where we had a marriage of this length where it was limited for [two] years and limited to this amount.

It is, of course, modifiable for any change of circumstance. It is gone if she remarries. It is gone if she cohabitates. Likewise, should he lose his job or his income be lowered, it can be varied on that basis also.

So, what I have tried to build in here is contingencies that will keep both of you out of court by lowering the maintenance in [seven] years, by securing the maintenance with the life insurance, and giving the husband a break--I know it is, albeit for only [two] months, but since he is paying the

daughter's, I think it should be $2,000 for

the next [two] months."

In May 2007, David filed a motion to vacate and reconsider, asking the trial court to reconsider its award of permanent maintenance. In July 2007, the court denied the motion. The court declined to reconsider its decision on maintenance and division of property in light of the disparity in income, the length of the marriage, and the fact that the property awarded to Barbara was, for the most part, nonincome producing.

This appeal followed.

## II. ANALYSIS

### A. The Trial Court Did Not Err in Its Award of Permanent Maintenance to Barbara

David first argues the trial court erred in its award of permanent maintenance to Barbara. We disagree.

Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) sets forth 12 factors for the trial court to consider in deciding whether to grant a temporary or permanent maintenance award, as follows:

"(1) the income and property of each

party, including marital property apportioned

and non[]marital property assigned to the

party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning ca-

- 11 -

pacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or de-layed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appro-priate education, training, and employment, and whether that party is able to support himself or herself through appropriate em-ployment or is the custodian of a child mak-ing it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emo-tional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circum-stances of the parties;

(10) contributions and services by the

party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable."  750 ILCS 5/504(a) (West 2006).

The trial court has the discretion to determine the amount and duration of an award of maintenance.  In re Marriage of Donovan, 361 Ill. App. 3d 1059, 1062, 838 N.E.2d 310, 314 (2005).  When a party challenges the trial court's factual findings, a reviewing court will affirm unless the court's findings were clearly against the manifest weight of the evidence.  In re Marriage of Wojcik, 362 Ill. App. 3d 144, 153, 838 N.E.2d 282, 290 (2005).  However, the court's ultimate decision to award maintenance will not be reversed on appeal absent an abuse of discretion.  Donovan, 361 Ill. App. 3d at 1062, 838 N.E.2d at 314.  An abuse of discretion occurs where no reasonable person would adopt the view taken by the trial court.  Wojcik, 362 Ill. App. 3d at 168, 838 N.E.2d at 302.  "Where an abuse of discretion in awarding or denying maintenance is claimed, the burden of showing such an abuse rests with the claiming party." In re Marriage of Homann, 276 Ill. App. 3d 236, 240, 658 N.E.2d

492, 495 (1995).

### 1. The Trial Court's Finding of David's Net Income Was Not Against the Manifest Weight of the Evidence

David argues the trial court's award of permanent maintenance was against the manifest weight of the evidence because the award was based on an inflated figure for his net income.  In determining the amount of maintenance, a trial court should consider the parties' income at the time of dissolution as well as their potential incomes.  In re Marriage of Harlow, 251 Ill. App. 3d 152, 161, 621 N.E.2d 929, 937 (1993).  A court's factual finding as to the parties' annual incomes will be reviewed under the manifest-weight-of-the-evidence standard. Wojcik, 362 Ill. App. 3d at 153, 838 N.E.2d at 290.

In this case, the judgment order does not indicate David's annual net income in the calculation of maintenance. David testified he earned $135,000 per year plus a 30% performance bonus.  His December 1, 2006, earnings statement shows gross pay of $204,469.44, including a bonus of $81,200.  A letter from his employer indicated the $81,200 included an executive bonus of $31,200 and a performance bonus of $50,000.  David testified this executive bonus was "a one-time thing" and characterized it as "unusual."  He received a $40,500 bonus in 2007, raising his total earnings for that year to $175,500.  He testified no other bonuses were forthcoming in 2007 and he had not deferred any bonuses or income.  At the hearing on the motion to

- 14 -

reconsider, the trial court indicated it made its decision on maintenance based on David's income of $204,000 versus Barbara's income of $37,000.

Here, the trial court's determination of David's net income was not clearly against the manifest weight of the evidence. The only evidence presented to the court regarding David's net income was his 2006 income of $204,000 and his 2007 income of $175,000. Although David testified that the $31,200 executive bonus in 2006 was "unusual," he presented no other evidence to show that he would not receive a similar or even greater performance bonus in the coming years.

While the trial court did not make an express finding as to David's credibility, the court clearly rejected David's testimony that the bonus was a one-time occurrence. The trier of fact is charged with assessing the credibility of a witness's testimony at trial. In re Marriage of Manker, 375 Ill. App. 3d 465, 477, 874 N.E.2d 880, 890 (2007). A reviewing court will defer to a trial court's determination of credibility because the trial court is in the best position to observe the conduct and demeanor of witnesses. Manker, 375 Ill. App. 3d at 477, 874 N.E.2d at 890. Therefore, this court defers to the trial court's implied finding of credibility and decision to base its order of maintenance on David's 2006 income.

Further, recognizing David's income may fluctuate from

year to year, the trial court specifically stated that David may ask the court for a modification if he experiences a substantial change in income. Therefore, the court's determination of David's net income was not against the manifest weight of the evidence.

### 2. The Trial Court Did Not Abuse Its Discretion in Its Division of Property

David argues the trial court erred in its allocation of marital and nonmarital property as its actual division of property did not meet the 60/40 split as intended by the parties. David also contends the error in the division of property resulted in an award of permanent maintenance that was against the manifest weight of the evidence.

Section 503(d) of the Dissolution Act requires the trial court divide marital property "in just proportions considering all relevant factors." 750 ILCS 5/503(d) (West 2006). The court has broad discretion in the distribution of marital assets. In re Marriage of Sawicki, 346 Ill. App. 3d 1107, 1113, 806 N.E.2d 701, 706 (2004). "The touchstone of proper and just apportionment is whether it is equitable in nature." In re Marriage of Dunlap, 294 Ill. App. 3d 768, 778, 690 N.E.2d 1023, 1029 (1998). An award of property in just proportions does not mean equal proportions, and a trial court does not abuse its discretion in awarding a larger share of the marital property to one party. In re Marriage of Murphy, 259 Ill. App. 3d 336, 344,

- 16 -

631 N.E.2d 893, 898 (1994).

In this case, the trial court did not itemize the division of marital property in the dissolution judgment. Further, some of the figures in the court's April 2007 dissolution judgment do not match those mentioned at the March 2007 hearing. The envelope of exhibits on appeal includes a two-page document of David's proposed distribution of property and maintenance. This document has no exhibit number but contains the court's strikeouts and additional handwritten figures in the distribution of property. The court referenced David's "proposed distribution" at the hearing, read through the items listed, and indicated any changes it had made. The court, however, made no mention of that document in the dissolution judgment.

David attempted to set forth the trial court's line-by-line distribution in his statement of facts and listed the amount awarded him as $104,644. Unfortunately, the numbers listed only total $85,869. In the distribution to Barbara, David listed $2,059.10 in her savings account, but he did not list the Bank of America account ($3,563) or the Mercantile Bank account ($1,447) mentioned in the court's order. David also stated Barbara received assets totaling $151,230, but the court apparently determined the amount to be $155,279. Barbara did not include a line-by-line itemization in her brief.

The trial court apparently awarded Barbara the follow-

ing:

| | |
|---|---|
| Her retirement fund | $ 30,691 |
| Bank of America account | $ 3,563 |
| Mercantile Bank account | $ 1,447 |
| Marital residence (equity) | $ 88,463 |
| Jeep | $ 10,000 |
| Toyota | $ 3,695 |
| Her personal property | $ 7,420 |
| David's payment | $ 10,000 |
| Total | $155,279 |

David received the following:

| | |
|---|---|
| Fidelity IRA | $ 29,159 (court's order states $30,691) |
| VISLINK account | $ 26,400 |
| Glenayre account | $ 31,820 |
| Household items | $    140 |
| Bank of America account | $ 16,016 (court's order states $23,700) |
| Chevy Trail Blazer | $    409 |
| Kayak | $    700 |
| Total | $104,644 |

Taking these figures into consideration, Barbara received 59.7% of the marital property, while David received 40.3%. David argues his $10,000 payment to Barbara was not removed from his total, thereby skewing the 60/40 distribution. With receipt of only $94,644, David's total actually amounted to 37.9% ($94,644/$249,923).

Although the percentages differ slightly from the proposed 60/40 distribution, the difference is minimal. See In re Marriage of Alexander, 368 Ill. App. 3d 192, 205, 857 N.E.2d 766, 776 (2006) (error in valuation of property was de minimus). Further, Barbara received few liquid assets, including the $14,000 in nonmarital stocks, while David had several accounts totaling over $100,000. The trial court did not abuse its discretion.

   3. The Trial Court Did Not Abuse Its Discretion in Awarding
                  Barbara Permanent Maintenance

David argues Barbara's good health, employment history, and lifestyle did not warrant an award of permanent maintenance.

Permanent maintenance should be awarded where a spouse is not employable or is only employable at a lower income as compared to the spouse's previous standard of living. In re Marriage of Schiltz, 358 Ill. App. 3d 1079, 1084, 833 N.E.2d 412, 415-16 (2005). A spouse should not be required to lower the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet his needs and the needs of his former spouse. In re Marriage of Drury, 317 Ill. App. 3d 201, 207, 740 N.E.2d 365, 369 (2000). A court's maintenance decision will not be overturned on appeal unless the court abused its discretion. In re Marriage of Gentry, 188 Ill. App. 3d 372, 376, 544 N.E.2d 435, 438 (1989).

Barbara testified her net income from her teaching positions amounted to approximately $2,500 per month. Her listed monthly expenses amounted to $3,500, which included nearly $1,200 for the mortgage and taxes that David had been paying. She testified her expenses reflected her current lifestyle as well as that which she enjoyed during the marriage. The trial court ordered David to pay $2,000 per month in permanent maintenance for April and May 2007, then $3,000 per month through May 2014. Beginning in May 2014, Barbara will receive between $800 and $1,300 from her Teacher's Retirement Fund. For this reason, the court required David to pay only $1,640 per month in permanent maintenance starting in May 2014.

The trial court's award of permanent maintenance in the amount of $3,000 through May 2014, and $1,640 thereafter, does not constitute an abuse of discretion. The testimony indicated Barbara's income failed to cover the monthly expenses needed to maintain the standard of living enjoyed during the 26-year marriage. She earned approximately $2,500 per month from teaching, and her salary would most likely not increase by a significant amount during the years leading up to retirement. David, on the other hand, had sufficient income to meet both his needs and Barbara's needs. Therefore, the court did not abuse its discretion in awarding Barbara maintenance on a permanent basis.

## B. The Trial Court Did Not Err in Ordering David To Maintain Life Insurance as Security for Barbara's Maintenance Payments

David argues the trial court erred in requiring him to maintain a policy of insurance to secure the maintenance payments in the event of David's death. We disagree.

This court has previously held that a trial court does not have the authority to order a payor of maintenance to keep an insurance policy on his life as security for maintenance. In re Marriage of Clarke, 125 Ill. App. 3d 432, 439, 465 N.E.2d 975, 979 (1984). The Clarke court based its holding, in large part, on section 510(b) of the Dissolution Act, which stated that the obligation to pay future maintenance terminated upon the death of either party. Clarke, 125 Ill. App. 3d at 436, 465 N.E.2d at 977; Ill. Rev. Stat. 1983, ch. 40, par. 510(b) ("Unless otherwise

agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party" (now found in 750 ILCS 5/510(c) (West 2006))). This court also relied on the fact that a previous version of the divorce statute contained a section allowing the trial court to order security for maintenance, while the current statute did not have a similar provision. Clarke, 125 Ill. App. 3d at 436-37, 465 N.E.2d at 977-78.

However, nine years later in In re Marriage of Vernon, 253 Ill. App. 3d 783, 625 N.E.2d 823 (1993), this court called into question the holding of Clarke and whether a court has the authority to order insurance as security for maintenance. In Vernon, this court reasoned that while the Dissolution Act does prohibit maintenance payments after a payor's death, the Dissolution Act does not prohibit payments during a payor's life that may have an effect after the payor's death. Vernon, 253 Ill. App. 3d at 789, 625 N.E.2d at 828. For example, a trial court is encouraged to award a large amount of property in lieu of maintenance, so that property, like insurance, is available to the payee after the payor's death. Vernon, 253 Ill. App. 3d at 789, 625 N.E.2d at 828. From this, the Vernon court concluded that section 510(b) of the Dissolution Act does not address the possible use and potential effect of maintenance payments but

- 22 -

only the time in which payments may be made.  <u>Vernon</u>, 253 Ill. App. 3d at 789, 625 N.E.2d at 828; see also Ill. Rev. Stat. 1983, ch. 40, par. 510(b) (now 750 ILCS 5/510(c)).

Further, <u>Vernon</u> explained that the current statute, which no longer contained a provision allowing the trial court to order security for maintenance, was not simply a revision of Illinois law but adoption of a standardized, uniform act. <u>Vernon</u>, 253 Ill. App. 3d at 789, 625 N.E.2d at 828.  Consequently, such an omission should not be construed as evincing a legislative intent to change the law and withdraw the court's authority to order security for maintenance.  <u>Vernon</u>, 253 Ill. App. 3d at 789, 625 N.E.2d at 828.

> "The [Dissolution] Act is not simply a revision of Illinois law, however, but a uniform act, and it may be inappropriate to give much weight to the fact that the uniform act does not contain specific provisions found in the earlier Illinois statute.  It is true that the Act specifically authorizes a court to set aside property in a trust for children (Ill. Rev. Stat. 1983, ch. 40, par. 503(g)),but it is difficult to read that specific authorization as a legislative prohibition of orders requiring a maintenance

- 23 -

obligor to maintain insurance on his life to prevent the premature termination of maintenance." Vernon, 253 Ill. App. 3d at 789, 625 N.E.2d at 828.

While the Dissolution Act does not contain language specifically authorizing a trial court to order security for maintenance, the legislature did not specifically prohibit such an order. Therefore, this court will not presume that an order requiring a payor to keep a life-insurance policy as security for maintenance violates the Dissolution Act's requirement that the obligation to pay maintenance terminate upon the death of either party. See Vernon, 253 Ill. App. 3d at 788, 625 N.E.2d at 827. "Only where the legislature may be said to have intended a particular requirement to serve as a limitation on the authority of the court to act should such a limitation be imposed." Vernon, 253 Ill. App. 3d at 788, 625 N.E.2d at 827.

In fact, the Dissolution Act grants the trial court wide discretion in awarding maintenance and dividing the marital property. The legislature directs a trial court to consider all relevant factors in its award of maintenance and authorizes a trial court to order maintenance for the duration and amount as it deems just. 750 ILCS 5/504 (West 2006). Similarly, the Dissolution Act grants a trial court the authority to divide the marital property in "just proportions." 750 ILCS 5/503(d) (West

2006). Further, in section 102(5), the legislature directs courts to liberally construe the Dissolution Act in order to make reasonable provisions for spouses. 750 ILCS 5/102(5) (West 2006).

> "This Act shall be liberally construed and applied to promote its underlying purposes, which are to:
>
> (1) provide adequate procedures for the solemnization and registration of marriage;
>
> (2) strengthen and preserve the integrity of marriage and safeguard family relationships;
>
> (3) promote the amicable settlement of disputes that have arisen between parties to a marriage;
>
> (4) mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage;
>
> (5) make reasonable provision for spouses and minor children during and after litigation, including provision for timely awards of interim fees to achieve substantial parity in parties' access to funds for litigation costs;

(6) eliminate the consideration of marital misconduct in the adjudication of rights and duties incident to the legal dissolution of marriage, legal separation[,] and declaration of invalidity of marriage;

(7) secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral[,] and emotional well-being of the children during and after the litigation; and

(8) make provision for the preservation and conservation of assets during the litigation."  750 ILCS 5/102 (West 2006).

In light of this liberal construction, sections 503 and 504 are sufficiently broad to allow the trial court to award a form of security for a maintenance obligation, not necessarily limited to life insurance.

In the present case, the trial court ordered David to maintain Barbara as the sole beneficiary on his employer-issued insurance policy during the time he was obligated to pay maintenance.  If life insurance were no longer available to David through his employer, the court required that David purchase life insurance and maintain Barbara as the sole beneficiary.  The court also ordered that in such an instance, David could deduct

the cost of the insurance policy from the monthly maintenance payment to Barbara.

The Act grants a trial court the discretionary authority to order a payor to keep a life-insurance policy to prevent the premature termination of maintenance, as it did in the present case. Contrary to David's argument, ordering a life-insurance policy as security for maintenance does not equate to payment after death but rather is a guard against premature death. Consequently, the court's order did not violate the prohibition in 510(c) of payments after death. See 750 ILCS 5/510(c) (West 2006). Therefore, the court did not err by requiring David to maintain a life-insurance policy with Barbara as the sole beneficiary so long as he was obligated to pay maintenance.

In In re Marriage of Ellinger, 378 Ill. App. 3d 497, 882 N.E.2d 692 (2008), the Third District utilizes a faulty rationale, applying a presumption that the legislature intended to change prior law by deleting language that gave a court discretion to designate life insurance as security for maintenance obligations. "Additionally, when the legislature deleted certain language from previous legislation, it is presumed that the legislature intended to change the law." Ellinger, 378 Ill. App. 3d at 499, 882 N.E.2d at 694. As previously stated, the legislature did not amend legislation; the legislature enacted a

completely new law; therefore, that presumption does not apply.

Ellinger erroneously relied on Forest City Erectors v. Industrial Comm'n, 264 Ill. App. 3d 436, 636 N.E.2d 969 (1994), for this presumption. However, Forest City Erectors did not address the legislature's enactment of a new law but rather dealt with an amendment to the Workers' Compensation Act (Ill. Rev. Stat. 1975, ch. 48, par. 138.8(d)(1)). The legislature changed the language in section 8(d)(1) of the Workers' Compensation Act providing "for wage differential benefits based on the 'difference between the average amount which [claimant] earned before the accident' and the average amount he is earning after the accident" (emphasis added and in original) (Forest City Erectors, 264 Ill. App. 3d at 440, 636 N.E.2d at 972, citing Ill. Rev. Stat. 1975, ch. 48, par. 138.8(d)(1) (see also Ill. Rev. Stat. 1973, ch. 138.8(d))), to "'the difference between the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident'" (emphasis in original) (Forest City Erectors, 264 Ill. App. 3d at 439, 636 N.E.2d at 972, quoting Ill. Rev. Stat. 1991, ch. 48, par. 138.8(d)(1)). The presumption of the legislature's intent to change the statute, therefore, applied in Forest City Erectors, 264 Ill. App. 3d 436, 636 N.E.2d 969, permitting the

commission to calculate benefits without regard to claimant's earnings prior to the accident.

In the case sub judice, however, the legislature's presumption is rebutted.

> "Where the legislature repeals an existing act and replaces it with an entirely new act, however, that presumption is rebutted. [People v.] Nunn, 77 Ill. 2d [243,] 248[, 396 N.E.2d 27, 29 (1979)].  In Nunn, the change in the relevant law came about because the legislature repealed the original statute in toto and replaced it and others with the Uniform Act Regulating Traffic on Highways (now the Illinois Vehicle Code).  Nunn, 77 Ill. 2d at 247[, 396 N.E.2d at 29].  Thus, this court concluded, 'the presumption is not invocable because the action of the legislature in 1935 was to adopt a new act *** and not to amend the previous statute.'  (Emphasis added.)  Nunn, 77 Ill. 2d at 248[, 396 N.E.2d at 29]."  In re K.C., 186 Ill. 2d 542, 549, 714 N.E.2d 491, 495 (1999).

Ellinger further errs in adopting Clarke's interpretation of the statutory language prohibiting an award of insurance as security

for maintenance.  There is no doubt the language in the statute is unclear and ambiguous.  Maintenance payments after death may be insured both by agreement and if "otherwise approved by the court."  Clarke argues "otherwise approved by the court" means:

> "The word 'approve' is defined by Black's Law
> Dictionary as follows: 'To be satisfied with;
> to confirm, ratify, sanction, or consent to
> some act or thing done by another.'  (Empha-
> sis added.)  (Black's Law Dictionary 94 (5th
> ed. 1979).)  The word is said to be distin-
> guished from the word 'authorize.'  Within
> the context of section 510(b) there must be a
> preexisting 'act' or 'thing' for the court to
> approve.  That 'act' or 'thing' is the agree-
> ment of the parties.  The court's authority
> in this case is not inherent.  It arises only
> when there is a written agreement of the
> parties which either has been incorporated in
> the judgment and approved in that manner or
> 'otherwise approved by the court.'"  Clarke,
> 125 Ill. App. 3d at 436, 465 N.E.2d at 977.

However, the Clarke court never explains how the court could "otherwise approve" such post-death maintenance payments.  In fact, the Clarke court found there was no such agreement and the

trial court had no authority to order unallocated maintenance beyond the husband's death. "Here, there was no such agreement. The court had no authority under section 510(b) to order unallocated maintenance beyond petitioner's death." Clarke, 125 Ill. App. 3d at 436, 465 N.E.2d 977.

However, the Clarke court is wrong on both counts. There was an agreement: a detailed property settlement agreement and an agreement to submit matters to the court for determination including inter alia security for unallocated maintenance and who should pay the premiums. What the Clarke court ignores until the last paragraph of the opinion is the reality that unallocated maintenance includes child support which the Clarke court at length explains can be secured by insurance. The Clarke court then finds it sufficient as security for child support that the parties allocated $100,000 in life insurance to the children as beneficiaries. However, the written agreement to provide the $100,000 in insurance and approved by the trial court was specifically for college expenses to "assume [the daughters'] support and payment of their educational expenses through four years of college or vocational school." That $100,000 insurance was not to secure child support but was for college expenses and those children were nowhere near college age. Regardless, Clarke should not be relied upon as authority for the proposition a trial court lacks the inherent authority to order insurance on

- 31 -

maintenance payments.

Unfortunately, Ellinger did not address the concerns raised in Vernon but simply dismissed Vernon as dicta. We hereby abandon Clarke and adopt the reasoning of Vernon.

The trial court's order to take out a life-insurance policy simply does not violate the Dissolution Act's requirement that the death of either party terminates the obligation to pay future maintenance. An insured makes no payments on a life-insurance policy after his death. Life insurance is designed to guard against the risk of premature death, not to leave large amounts of money after the death of the parties. Moreover, the insurance company, not the insured's estate, pays the proceeds to the ex-wife upon the insured's death, negating any concept of postmortem alimony. A. Rutkin, Family Law and Practice, §§45.02[2], 45-10 (1985). Further, many life-insurance policies, like other insurance policies, never pay out. Consider the operation of a term life-insurance policy. A spouse usually would not keep renewing such a policy until the date of his death, only until the period of risk expired. For example, a spouse might stop renewing such a policy after family debts have been paid off or his pension has kicked in. The policy here would be terminated upon death of either spouse or remarriage of Barbara.

The legislature did not intend that a trial court never

order that a maintenance payor name his ex-spouse as beneficiary on his life insurance.  We cannot simply make the assumption that the legislature intended the court never be able to order life insurance as security.  If there can be no life insurance, a judge trying to make a fair division cannot give much weight to the fact that the ex-spouse is ordered to pay maintenance.  That order may result in the ex-spouse paying hundreds of thousands of dollars or it may result in him paying almost nothing if he died quickly.  The legislature does not require such uncertainty.  An order for life insurance is not like ordering a 50-year-old man to pay maintenance for 60 years even after death, the type of action the legislature intended to prohibit.  Equating an order to maintain life insurance for the benefit of securing maintenance to maintenance is simply erroneous.

Further, to carry the dissent's argument to its logical conclusion, neither can child support be secured by life insurance because the legislature has not specifically authorized life insurance as security for child support.  The legislature only authorized child support after death and setting aside a portion of an estate to pay that child support.  Obviously, the legislature intended the trial court to broadly interpret the Dissolution Act to do justice by the parties.  This trial court did a yeoman's job at doing justice to the parties.  We cannot now say the court abused its discretion.

In a particular case, the trial court may appropriately limit how long the policy must be kept in force. A court may appropriately order the use of a term policy, not a whole-life policy, although another solution may be to recognize the asset value of the whole-life policy in the division of assets. In fact, the court here recognized the gross disparity of income, Barbara's bare-bones budget, David's putting away $1,000 a month in a 401K, and the parties' lifestyle. The court balanced the equities, accounted for contingencies, and adjusted maintenance down for college expenses and retirement. The court recognized that maintenance ends upon death and chose to secure that maintenance with life insurance, stating, "My biggest concern about maintenance is, ma'am, if I were to award you the maintenance and he would, unfortunately, walk out here and get hit by a car, the maintenance is gone, because it ends upon his death."

It is one thing to hold that a trial court's failure to comply with a statute is error. It is much more drastic to hold that a court's action is not authorized by statute. If the legislature wants to declare that an action is prohibited, the legislature should be specific. Here, Clarke was decided in 1984 and Vernon in 1993, and the legislature has apparently chosen not to amend the statute to correct an interpretation that life insurance may be ordered to secure maintenance payments.

III. CONCLUSION

- 34 -

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

COOK, J., specially concurs.

TURNER, J., specially concurs in part and dissents in part.

JUSTICE COOK, specially concurring:

Justice Turner's special concurrence/dissent characterizes our holding in Vernon as dicta, a casual discussion we had no reason to make, because the parties had not raised the issue. However, the issue of subject-matter jurisdiction cannot be waived and a court has the duty to assess its subject-matter jurisdiction, regardless of whether the parties question it. Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., 199 Ill. 2d 325, 333-34, 770 N.E.2d 177, 184 (2002) (argument "implicates the subject matter jurisdiction of the circuit court"); Jackson v. Alverez, 358 Ill. App. 3d 555, 558, 831 N.E.2d 1159, 1162 (2005). Belleville Toyota cited Mitchell and Vernon with approval, in fact quoting the above language from Vernon. Belleville, 199 Ill. 2d at 341, 770 N.E.2d at 188. The Vernon holding was not dicta. It was our duty to consider our subject-matter jurisdiction even though the issue was not raised by the parties.

Did the legislature intend that courts have no power to order payors of maintenance to obtain life insurance? The dissent discusses language in the child support portion of the Dissolution Act, the presumption that deletion of language from previous legislation manifests an intent to change the law, and the laws of other states. The best evidence of legislative intent, however, is the language used in the statute itself,

- 36 -

which must be given its plain and ordinary meaning.  What did the legislature mean when it said that "the obligation to pay future maintenance is terminated upon the death of either party"?  750 ILCS 5/510(c) (West 2006).  The language says nothing about life insurance.  Payments on a life-insurance policy are not made after death.  There is nothing inherently wrong with requiring life insurance in maintenance cases, as is shown by the fact that many other states allow it.  Illinois clearly allowed requiring life insurance under the prior statute.  Dissolution of marriage cases are complicated and may involve very diverse asset and income situations.  The legislature did not attempt to spell out exactly how these cases should be handled.  The legislature gave the courts broad powers to deal with these situations, and did not intend courts to act only to the extent the legislature made specific provision therefor.

JUSTICE TURNER, specially concurring in part and dissenting in part:

Because I believe the trial court erred in calculating David's net income in its award of permanent maintenance to Barbara and in requiring David to maintain a policy of life insurance to secure the maintenance payments, I dissent. I concur in the majority's affirmance of the award of permanent maintenance and the property distribution.

## A. Net Income

I would find the trial court's determination of David's income to be against the manifest weight of the evidence. The court's determination of maintenance appears to have been made using David's gross income from 2006, which included a large one-time bonus. David indicated the bonus was unusual and unlikely to recur. It appears the court's consideration of David's income of $204,000, with no exception for any fluctuations in the bonuses David might receive, directly impacted the amount of the permanent maintenance award. Although I would find the court did not abuse its discretion in awarding maintenance on a permanent basis, I would remand for a new maintenance determination based on David's income without considering the one-time bonus.

## B. Insurance Policy

I would also find the trial court erred in requiring David to maintain a policy of life insurance to secure the

maintenance payments. Section 504 of the Dissolution Act authorizes a trial court to order one spouse to pay maintenance. 750 ILCS 5/504 (West 2006). "Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2006).

The majority here holds a trial court may require a spouse to maintain life insurance as security for maintenance payments, while the Third District recently came to the opposite conclusion on this issue. In Ellinger, 378 Ill. App. 3d at 498, 882 N.E.2d at 693, the trial court ordered the ex-husband to pay his ex-wife maintenance on a monthly basis. The court also required him to maintain his ex-wife as the sole beneficiary of an insurance policy for as long as the maintenance obligation lasted. Ellinger, 378 Ill. App. 3d at 498-99, 882 N.E.2d at 693.

On appeal, the ex-husband argued the trial court erred in requiring him to designate his ex-wife as the beneficiary of the life-insurance policy as security for his maintenance obligation. Ellinger, 378 Ill. App. 3d at 499, 882 N.E.2d at 694. The Third District noted neither section 504 nor any other section of the Dissolution Act granted the trial court the

authority to require the maintenance-paying spouse to designate the receiving spouse as a beneficiary of a life-insurance policy as security for the maintenance payments. Ellinger, 378 Ill. App. 3d at 500, 882 N.E.2d at 694. The appellate court also found the language of the Dissolution Act allowing for the designation of assets as security for child-support payments did not have a corresponding provision authorizing the same for maintenance obligations. Ellinger, 378 Ill. App. 3d at 500, 882 N.E.2d at 694-95. Thus, the court "presume[d] that the legislature intended different results by the different language in the [Dissolution] Act concerning child support compared with its language regarding maintenance." Ellinger, 378 Ill. App. 3d at 500, 882 N.E.2d at 695.

In the case sub judice, the parties did not enter into an agreement providing David would maintain life insurance to secure the maintenance payments. Instead, the trial court ordered David to designate Barbara as the sole beneficiary on his employer-issued insurance policy during the time he was obligated to pay maintenance. If David lost his job, the court would require him to purchase life insurance and maintain Barbara as the sole beneficiary. Based on Ellinger and this court's decision in Clarke, I would find the court erred by requiring David to maintain a life-insurance policy with Barbara as the sole beneficiary so long as he was obligated to pay maintenance. See

- 40 -

In re Marriage of Feldman, 199 Ill. App. 3d 1002, 1007, 557 N.E.2d 1004, 1008 (1990) (finding the trial court lacked authority to enter a maintenance award secured by life insurance). The Dissolution Act provides no authority to the court to do so in the context of maintenance.

The majority, however, disagrees with Ellinger and disregards Clarke in favor of Vernon. Not only was the Vernon court's discussion of Clarke dicta (see Ellinger, 378 Ill. App. 3d at 501, 882 N.E.2d at 695), but the reasoning failed to give proper deference to the legislature in this area of the law. Clearly, the General Assembly has the legislative authority to grant trial courts the discretion to designate assets as security for maintenance obligations as it has similarly done in the child-support area. See Ellinger, 378 Ill. App. 3d at 500, 882 N.E.2d at 694, citing 750 ILCS 5/510(d) (West 2006) (providing child support may be enforced after the payor parent's death) and 750 ILCS 5/503(g) (West 2006) (allowing a court to set aside a portion of the estate in a separate fund or trust for child support).

I would also note that in the almost 15 years since Vernon's publication, it has not once been cited for the proposition that a trial court has statutory authority to order the procurement of life insurance as security for maintenance. Nonetheless, the two-judge majority in this case audaciously

proclaims "we hereby abandon Clarke and adopt the reasoning of Vernon." Slip op. at 29. In the end, I disagree with the majority, which syllogistically justifies its holding as follows: because the Dissolution Act does not prohibit an order requiring insurance as security for maintenance payments, because the trial court should have wide discretion in this area, and because courts are to liberally construe the Dissolution Act to make reasonable provisions for spouses, the courts should have the discretion to secure maintenance payments through life insurance. QED.

The majority's holding leaves an open question of what factors the trial court should consider when deciding whether to order an ex-spouse to maintain an insurance policy to secure maintenance payments. In my view, these factors should be decided through the legislative process. Under South Carolina law, for example, a trial court must undertake a comprehensive review of multiple factors when ordering a payor spouse to carry life insurance, including "the cost of premiums, insurance plans carried by the parties during marriage, insurability of the payor spouse, the probable economic condition of the supported spouse upon the death of the payor spouse, and any other factors the court may deem relevant." S.C. Code Ann. §20-3-130(D) (Supp. 2007); see also Wooten v. Wooten, 364 S.C. 532, 551, 615 S.E.2d 98, 107 (2005). As one can readily determine, these factors are

explicitly set forth in the state statute.

Other states have also enacted legislation allowing a trial court to order security for maintenance obligations. See Fla. Stat. Ann. §61.08(3) (West 2004) ("the court may order any party who is ordered to pay alimony to purchase or maintain a life[-]insurance policy or a bond, or to otherwise secure such alimony award with any other assets which may be suitable for that purpose"); N.Y. Dom. Rel. Law §243 (McKinney 1999) (the court "may direct the spouse from whom maintenance or support is sought to give reasonable security, in such a manner and within such a time as it thinks proper, for the payment, from time to time, of the sums of money required for that purpose"); 19 Me. Rev. Stat. Ann. tit. 19-A, §951-A(7) (Supp. 2007) ("The court may also order the obligated party to maintain life insurance or to otherwise provide security for the payment of spousal support in the event the obligation may survive the obligated party's death"); Conn. Gen. Stat. §46b-82(a) (2004) (in entering an alimony decree, "the court may order that a party obtain life insurance as such security unless such party proves, by a preponderance of the evidence, that such insurance is not available to such party, such party is unable to pay the cost of such insurance[,] or such party is uninsurable"); N.D. Cent. Code §14-05-25 (1983) ("The court may require either party to give reasonable security for providing maintenance or making any payments"); Vt.

Stat. Ann. tit. 15, §757 (1981) (in granting maintenance, "the court may require sufficient security to be given for payment thereof"); see also Brockman v. Brockman, 264 Neb. 106, 112, 646 N.W.2d 594, 599 (2002) (noting the Nebraska legislature "has long given specific statutory authorization for a court, in an appropriate case, to require sufficient security to be given for the payment of alimony and child support awards"); Jacobitti v. Jacobitti, 135 N.J. 571, 578, 641 A.2d 535, 539 (1994) (stating the New Jersey legislature explicitly allowed "a court to order the supporting spouse to maintain life insurance for the benefit of the dependent spouse to protect the dependent spouse if the dependent spouse outlives the supporting spouse").

The preceding statutes and case law offer confirmation that whether courts should be authorized to order procurement of insurance as security for maintenance is a matter for the legislature to debate and decide after careful deliberation. The majority articulates reasons why courts should have the power to order payors of maintenance to obtain life insurance. However, the question here is not whether requiring life insurance in maintenance cases is right or wrong. The issue is simply whether this court or the legislature should make the law, and I decidedly believe it should be the latter. Accordingly, I would reverse that portion of the trial court's judgment order requiring David to maintain a life-insurance policy with Barbara as the

beneficiary.