NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241016-U

NO. 4-24-1016

IN THE APPELLATE COURT

FILED
July 15, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF EADS | ) | Appeal from the |
| | ) | Circuit Court of |
| (Christopher Paul Eads, | ) | Peoria County |
| Petitioner-Appellee, | ) | No. 23DN119 |
| and | ) | |
| Mary Josephine Eads, | ) | Honorable |
| Respondent-Appellant). | ) | Daniel M. Cordis, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed the trial court's judgment of dissolution of marriage awarding maintenance to the husband, but it reversed the court's allocation of debts and assets and its order requiring the wife to pay most of the husband's attorney fees.

¶ 2     In April 2023, after nearly 10 years of marriage, petitioner, Christopher Paul Eads, petitioned for the dissolution of his marriage to respondent, Mary Josephine Eads. After a trial on the issues of spousal maintenance and the allocation of marital debts and assets, the trial court ordered Mary to pay Christopher $769 per month in maintenance for 45 months, largely because Christopher's disability severely limited his prospects of working in the future. The court also allocated slightly more value in marital assets to Christopher than to Mary and ordered Mary to pay most of Christopher's attorney fees.

¶ 3     Mary appeals the trial court's judgment. She challenges the court's allocation of

debts and assets, its order that she pay maintenance, and its order that she pay Christopher's attorney fees.

¶ 4        We affirm the trial court's award of maintenance to Christopher, but we reverse its allocation of marital debts and assets and its attorney fees award, and we remand for further proceedings.

¶ 5                                I. BACKGROUND

¶ 6        Mary and Christopher married on September 26, 2013. On April 21, 2023, Christopher filed a petition for dissolution of marriage, and eventually the matter proceeded to trial.

¶ 7        At trial, Christopher testified that he had chronic obstructive pulmonary disease (COPD), emphysema, two replacement hips, spinal stenosis, type 2 diabetes, "spinal problems," and "lumbar problems." At the time of the trial, he lived in a one-bedroom unit in a "halfway home," and he brought only his clothes with him when he moved out of the marital residence. He was not employed. He began receiving Social Security Disability Insurance (SSDI) benefits in 2018, and his monthly benefits had recently increased to $2,193 per month.

¶ 8        Christopher contrasted his standard of living at the time of trial with his standard of living during his marriage. Describing the couple's lifestyle together, he testified, "It was good. We pretty much did what we wanted. You know, we went out to eat when we wanted." At the beginning of the marriage, the parties first lived in a three-bedroom home in Hopewell Estates, outside Chillicothe, Illinois. They had to sell the house because the payments were too high, and, according to Christopher, Mary refused to contribute. Afterwards, they moved to a house in Chillicothe on Hoyt Street. Christopher testified that he wrote Mary checks for between $750 and $1,000 per month from his SSDI for living expenses. He also claimed that he "would buy all of

the groceries" and pay for meals when they went out to eat.

¶ 9        Christopher testified that he worked for Dunlap School District at the beginning of the marriage, but he was asked to resign in 2015. After he left that position, he received unemployment benefits for about six months. He was asked if he had another job when his unemployment benefits ended, and he answered, "I didn't have to because my father died and left me money." He received a total of $75,000 from his father's estate. He testified that he "[s]pent it on us," referring to himself and Mary. He also cashed in his 401(k) for $25,000. He testified, "We purchased a four wheeler, trailers, motorcycles, go-karts, four wheelers, you name it, all kinds of stuff we probably shouldn't have been buying. A camper I believe was involved in all that." He added that he had to sell these vehicles after he "got sick" in 2016. He also spent money on a cleaning franchise, which lasted only about five months. He claimed that after he sold off everything, he used the money to pay "bills." He tried a job performing minor maintenance work at a trailer park. He also tried working part-time for a nursing home. But, he testified, "I can't breathe good, and I have two new hips, and I have a terrible back." He acknowledged that he still smoked, he used to have problems with alcohol, and he had been to "rehab" three times.

¶ 10        Christopher possessed a 2010 Chevrolet Silverado. The couple owned a 2014 Dodge Challenger, 2020 Chevrolet Blazer, and a 2012 Harley Davidson. The couple also owned a 2016 Cub Cadet all-terrain vehicle (ATV), a 14-foot Jon boat, a paddle boat, and a kayak, as well as a cabin at Giant Goose Ranch. During the pendency of the case, Mary sold the parties' house on Hoyt Street to fund the purchase of a new house. Christopher testified that in 2021 or 2022, Mary went on five vacations.

¶ 11        Mary testified she worked for Caterpillar in Peoria, Illinois, as a procurement engineer. Her salary was $84,000. She typically received a year-end bonus, which, in 2023, was

$12,637. From 2021 to the beginning of 2023, she also worked as a property manager, and she estimated she made at least $5,000 per year from that work.

¶ 12     In 2022, Mary's daughter and granddaughter died in a car crash, and Mary took custody of her other two grandchildren. She received slightly over $2,200 per month from social security on behalf of the children, and the children each have $33,000 in an account that they can access when they turn 18.

¶ 13     Mary insisted that she paid much more of the couple's bills during the marriage. According to Mary, Christopher gave her $750 per month, never $1,000, unless he was paying her back for something, and for some months he paid nothing. She added that Christopher bought groceries only for himself. She claimed that Christopher lied about the amount he inherited, and whatever he received, she "didn't see it." She testified that she hardly ever used the vehicles Christopher purchased. She also claimed that when he cashed in his 401(k), he used the funds for his cleaning business and vehicles, which he later sold. She assumed he used that money for drugs and alcohol.

¶ 14     Mary denied that she contributed nothing to the household at the beginning of the marriage. She testified that, at that time, she worked as an administrative assistant, making $12,000 per year. Her 2015 W-2, which was admitted into evidence, showed that her salary that year was $52,829.70. She expected that she started handling more of the financial obligations in 2016 or 2017. She also testified that when she purchased the Chillicothe house in 2018, Christopher did not contribute anything.

¶ 15     Once Christopher began receiving SSDI benefits, he also received a back payment. The following exchange took place between Mary and her attorney:

"Q. He received a settlement?

A. Uh-huh for back pay.

Q. What kind of settlement?

A. Back pay for—

Q. Of disability?

A. It was, uh-huh, it was like $5,000.

Q. $56,000?

A. I'm sorry. $56,000.

Q. So, you received a check of $56,000 in back pay?

A. Yes.

Q. Did you see any of that money?

A. No.

Q. Did he use it to contribute to the bills or the debts?

A. No.

Q. Did he use it to do any upgrades on the house?

A. On the Hoyt house?

Q. Yes?

A. No.

Q. So, he received [an SSDI] back pay of $56,000 while you were providing all the food and everything during that time?

A. Yes.

Q. And then he gets the settlement and didn't pay you back for any of the bills or anything like that?

A. No.

Q. Do you know what he did with the money?

A. He bought a camper which, yes, I used. He bought a four wheeler and a trailer to do—he was going to do his own business again, so he bought an enclosed trailer. He was going to do a construction business. That never happened. I don't remember what else was bought."

¶ 16      Mary testified that she had back problems, including two bulging discs, that required surgery. She had six previous back surgeries related to her spinal stenosis and degenerative disk disease. She was able to work at the time of the trial, but she testified, "I don't know how long I'm going to be able to continue."

¶ 17      Mary admitted that she had taken a two-week vacation in April 2022 to Germany, Italy, Ireland, and Spain. This trip cost about $4,000, which her son paid upfront, and she gradually reimbursed him. In May 2022, she went to Florida. She was asked if she took "any other vacations during [her] marriage with [Christopher]." She answered that they took trips to Arizona and Tennessee. Later, she said that she thought the Tennessee trip took place before the marriage.

¶ 18      Mary insisted that Christopher was able to work while he received SSDI. She claimed that if he could sit in court for hours at a time, then he could sit at a desk for a few hours as well. She added that he was able to drive for at least an hour, and he did manual work around the house, including remodeling the kitchen.

¶ 19      Christopher took the stand again and denied that he spent his retirement and his inheritance just on himself. He insisted:

"I was so good to her family. I gave them money, and I gave them things. They— we all ate really good, and they—all the kids would come over, and they rode the Go-Karts, and the dirt bikes, and the 4 wheelers, and it was a big, fun time, big

party."

¶ 20    Kendra Deemie, Mary's daughter, testified that she visited her mother at her house at least once a week. She saw Christopher repairing or remodeling the bathroom and the kitchen. Deemie testified that Christopher rarely helped with cleaning or cooking, and he drank a lot. On five or six occasions, she heard Christopher tell Mary that he did not have money to give her toward rent. She knew that he contributed, but sometimes he did not.

¶ 21    The evidence also included the parties' financial affidavits, Kelly Blue Book estimates for the value of the parties' vehicles, pictures of Mary's home, pictures of vehicles, pictures of the cabin, a closing statement for the sale of the Hoyt Street residence, Mary's W-2 from 2015 from Caterpillar, loan statements, and bank statements, among other documents.

¶ 22    The trial court issued a thorough written opinion detailing its factual findings and allocating marital debts and assets. The court found that Christopher was the "primary breadwinner" at the beginning of the parties' marriage, but Mary later took over that role. She worked for Caterpillar and advanced in position and salary throughout the marriage, earning almost $85,000 by the time of the trial. She received annual bonuses, expected to be between $10,000 and $12,000. After obtaining guardianship of her two grandchildren in 2022, Mary purchased a new home, and she received $2,200 per month from social security for childcare expenses.

¶ 23    The trial court found that Christopher began receiving SSDI benefits in 2018, and he received $2,193 per month. Since he lost his job with Dunlap schools in 2015, he tried a few other jobs, including part-time work at a nursing home, which was not "sustainable for him." The court found that Christopher used his $75,000 inheritance and $25,000 from his retirement account to "purchase many recreational items such as a camper, go-cart(s), trailer(s), motorcycles, an ATV

and the like." The court found that during the marriage, "the parties were able to dine out, purchase extra vehicles such as motorcycles or the Dodge Challenger, engage in recreation with the various items of equipment/vehicles referenced, purchase a cabin for leisure/vacation/recreation and travel for vacations." The court added that Mary traveled more than Christopher and that the housing and vehicles generated "a fair amount of debt."

¶ 24        The trial court then analyzed each of the statutory factors relevant to assigning marital debt and assets, specifying whether each factor counted in either party's favor. See 750 ILCS 5/503(d) (West 2024). The court acknowledged Mary's obligations to her grandchildren and considered this a factor in favor of a more generous allocation to Mary. However, it found more factors favored Christopher. For example, considering the parties' economic circumstances after the divorce, the court found, "Christopher is earning about one-quarter (1/4) of what Mary earns." The court especially noted, "The Federal government has concluded he is disabled." It also found Christopher has less opportunity for future acquisition of income and assets. The court found many of the factors were neutral or not applicable. Most notably, the court found that each party's contribution to the marital estate did not affect its allocation.

¶ 25        The trial court elaborated on a few specific aspects of its allocation. For example, the court determined that all of Mary's 401(k) was marital property, so it ordered that each party receive half of the value of the account. The court also stated:

> "The Court does not know exactly how much is owed by Christopher for back pay associated with his [SSDI] award. Mary testified the liability is $56,000.00, but there were no contemporaneous statements introduced into evidence. It is equitable to make Christopher responsible for this debt due to him being the recipient of the [SSDI] benefits. Even so, that is a large debt in this marital estate, and making

Christopher responsible for it further justifies 'tipping the scales' a bit in his favor in terms of the distribution of the other assets and debts in *Exhibit A*."

¶ 26     The trial court attached to its opinion a chart laying out the allocation of the parties' debts and assets, labeled "EXHIBIT A." To Mary, the court assigned assets totaling $403,889 and debts totaling $345.439, for a net value of $58,450. Mary's new house accounted for most of her debts and assets. To Christopher, the court assigned $88,593.48 in assets and $26,593.00 in debts, for a net value of $62,000.48. The court assigned the "SSDI-Back Debt" to Christopher, without listing a balance on that debt, and the "2023 Income Tax Refund" to Mary, without assigning a value. The court also ordered the parties to sell their cabin and divide the proceeds evenly.

¶ 27     The trial court ordered Mary to pay Christopher $769 in maintenance for 45 months, referring to the calculations provided by Christopher's attorney. Discussing the statutory factors regarding spousal maintenance, the court first stated that its division of debts and assets was close to equal, but "Christopher's income situation [was] significantly inferior to that of Mary." The court rejected Mary's contention that Christopher only chose not to work, finding instead that Christopher's disability limited his opportunities for employment.

¶ 28     The trial court also explained:

"A somewhat related argument by Mary is that Christopher did drugs, drank alcohol to excess and was overall a financial millstone around the marriage's neck. Even if all of this were accurate, the Court sees the issue differently—if, upon the loss of Christopher's long-time job at Dunlap schools, he became depressed or turned to drugs and alcohol to make himself feel better and cope, that does not *per se* make him unworthy of a spousal maintenance award. Each case and every person is different. Christopher has been in and out of rehab several times. He

- 9 -

appears to be succeeding at sobriety at present, and he has been living in communal sober housing in Peoria. Bottom line—Christopher's addictions and struggles do not disqualify him from receiving spousal maintenance."

The court acknowledged that Mary's need to provide for her grandchildren supported a denial of maintenance. But, overall, the court found more factors in favor of maintenance. See *id.* § 504.

¶ 29 Finally, the trial court ordered Mary to pay $3,000 out of Christopher's attorney fees. Citing section 503(j) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (*id.* § 503(j)), the court referred to its earlier analysis of marital property and maintenance to explain this award. This $3,000 was listed as one of Mary's debts in the court's Exhibit A.

¶ 30 Mary filed a motion to reconsider or vacate the judgment, which the trial court denied.

¶ 31 This appeal followed.

¶ 32 II. ANALYSIS

¶ 33 Mary asks us to reverse the trial court's order awarding Christopher maintenance, allocating marital debts and assets, and requiring her to pay $3,000 in Christopher's attorney fees.

¶ 34 A. Maintenance

¶ 35 We begin with maintenance. "[T]he propriety of a maintenance award is within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion." *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). "A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court." *Id.* On appeal, the party seeking reversal of the trial court's decision bears the burden of showing an abuse of discretion. *Id.* Additionally, when reviewing the trial court's award of maintenance, we will accept the court's factual findings unless those findings are contrary to the manifest weight of the

evidence. *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 3. "Findings are against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *In re Marriage of Smith*, 2012 IL App (2d) 110522, ¶ 46. "Generally, we also will not disturb a trial court's credibility determinations." *In re Marriage of Edson*, 2023 IL App (1st) 230236, ¶ 105.

¶ 36        In considering whether to award maintenance, the trial court relied on the factors listed in section 504(a) of the Marriage Act (750 ILCS 5/504(a) (West 2024)). From this list, the court determined the following factors favored awarding Christopher maintenance: the income and property of each party (*id.* § 504(a)(1)); each party's present and future earning capacity (*id.* § 504(a)(3)); the time necessary for Christopher to acquire appropriate education, training, or employment, and his ability to support himself through appropriate employment (*id.* § 504(a)(6)); the parties' standard of living during the marriage (*id.* § 504(a)(7)); the age, health, station, occupation, income, skills, employability, liabilities, and needs of each party (*id.* § 504(a)(9)); and all sources of income, including SSDI and retirement income (*id.* § 504(a)(10)). The court found Mary's needs, especially her obligation to provide for her two grandchildren, weighed against maintenance for Christopher. See *id.* § 504(a)(2). The court concluded that the remaining factors did not apply.

¶ 37        On appeal, Mary challenges three aspects of the trial court's analysis: the parties' standard of living, Christopher's disability, and how Christopher's alleged depression affected his ability to support himself or contribute to the marital estate.

¶ 38        First, Mary argues the trial court improperly inflated the parties' lifestyle during their marriage. Although the court referred to the parties' vacations, cabin, and recreational vehicles as examples of luxuries the couple could afford, Mary insists the parties enjoyed these

comforts only early in their marriage. She argues that the court improperly took a "snapshot" from the parties' station in 2015 instead of considering the entire nine-year marriage. She further contends that the court inflated the value of their extra vehicles and cabin, failing to recognize the substantial debts that remained on those purchases. Finally, Mary argues that the court ignored that she also could not maintain the same standard of living because, soon before the parties' separation, she became responsible for two of her grandchildren. She argues, "[E]ven if the parties had stayed married, their lifestyle and standard of living that they enjoyed prior to this tragedy would never have been the same."

¶ 39       The trial court's characterization of the parties' standard of living was not contrary to the manifest weight of the evidence. The court fairly restated the parties' testimony concerning their many vehicles and their cabin. Based on Mary's own testimony, the court found that she took vacations to Arizona, Tennessee, Florida, and Europe. These vacations were not limited to the first few years of the marriage. Moreover, Mary's claim that the court failed to recognize the debt associated with these expenditures is incorrect. The court explicitly recognized that the couple had "taken on a fair amount of debt with regard to housing and vehicles." The court summarized the evidence at trial reasonably, so we accept the court's factual findings on the parties' standard of living.

¶ 40       The trial court also did not abuse its discretion in considering this factor in Christopher's favor, despite Mary taking responsibility for her grandchildren. Although Mary's standard of living certainly changed after the parties separated, she also moved into a three-bedroom house and held a well-paying job. Christopher rented a one-bedroom "halfway home," and he had no or very limited work prospects. The court also recognized Mary's childcare obligations as a factor weighing against maintenance.

¶ 41	Mary next disputes the trial court's determination that Christopher was unable to support himself. She contends that Christopher has deliberately chosen not to work full-time since 2015, when he received the $75,000 inheritance and cashed in his 401(k). According to Mary, Christopher was able to work, as indicated by the maintenance work he performed and his ability to sit through the court proceedings. At the very least, Mary insists, he can work an office job.

¶ 42	Mary compares this case to *Smith*, 2012 IL App (2d) 110522. There, a wife petitioned for a dissolution of marriage, and the respondent husband sought spousal maintenance. *Id.* ¶¶ 1, 26. The husband received SSDI benefits and claimed he was "unable to earn a living." *Id.* ¶ 28. The wife disagreed, claiming he was capable of at least some forms of gainful employment. *Id.* ¶ 9. Although the trial court awarded the husband some maintenance, it also agreed with the wife that he could work, so it reduced the maintenance award accordingly. *Id.* ¶ 35. On appeal, the husband argued that the trial court abused its discretion, and he should receive more in maintenance. *Id.* ¶ 43. The appellate court affirmed the trial court's finding, agreeing that the husband's frequent trips to the dog track to gamble indicated he could leave the house frequently to work. *Id.* ¶ 48. Mary contends that the same reasoning applies here, and Christopher likewise is capable of "holding a desk job."

¶ 43	Once again, we accept the trial court's factual determinations. The court found Christopher had "very limited earning potential[ ]" because of his physical limitations. Undeniably, Christopher received SSDI benefits. He testified to a long list of ailments, including COPD and emphysema. We note especially Christopher's testimony that he tried working part-time at a nursing home. But, he explained, "I can't breathe good, and I have two new hips, and I have a terrible back." All this evidence supported the court's conclusion.

¶ 44	*Smith* does not change our analysis. There, the trial court found the husband was

not permanently disabled. *Id.* Here, the court found Christopher was. We defer to the trial court's credibility determinations. See *Edson*, 2023 IL App (1st) 230236, ¶ 105. Moreover, we see nothing in the appellate court's opinion in *Smith* comparable to Christopher's explicit testimony about his unsuccessful attempt to hold a specific part-time job after developing his disability. Considering this evidence, we cannot say that the court's factual findings here were "unreasonable, arbitrary, and not based on any of the evidence." *Smith*, 2012 IL App (2d) 110522, ¶ 46.

¶ 45    Finally, Mary argues the trial court erroneously assumed that Christopher abused drugs and alcohol because of depression resulting from the loss of his job. She claims that no evidence was introduced showing that Christopher suffered from depression or drank because of depression. Instead, Mary testified that Christopher had a drinking problem throughout the marriage, even before he lost his job in 2015. Therefore, according to Mary, the court's finding otherwise was contrary to the manifest weigh of the evidence.

¶ 46    Mary's argument does not affect our decision. When discussing Christopher's likelihood of supporting himself through appropriate employment in the future, the trial court considered Mary's claim that Christopher "did drugs, drank alcohol to excess and was overall a financial millstone around the marriage's neck." The court responded, "Even if all of this were accurate *** that does not *per se* make him unworthy of a spousal maintenance award." The court did not make an explicit factual finding that Christopher became depressed after losing his job in 2015. Instead, it found that "Christopher's addictions and struggles do not disqualify him from receiving spousal maintenance." Mary cites no authority to refute this conclusion, and we see no reason to reject it.

¶ 47    Having rejected Mary's challenges to the trial court's decision to award maintenance, we briefly address her assertion that the court erred in the amount and duration of

maintenance. The court awarded Christopher $769 in maintenance for 45 months, adopting Christopher's calculations, which followed the statutory guidelines set by section 504(b-1)(1) of the Marriage Act. See 750 ILCS 5/504(b-1)(1) (West 2024). Mary does not raise any specific argument here. She does not argue that the court misapplied the statutory guidelines in section 504(b-1)(1). She does not cite any place in the record to refute the numbers that Christopher and the court relied on for these calculations. Nor does she argue that the court abused its discretion by following the guidelines. Instead, she simply refers to her arguments regarding the award of maintenance generally, and she urges us to order the trial court to reconsider the duration and amount of maintenance.

¶ 48          We affirm the trial court's decision. We reject Mary's arguments for the same reasons discussed above. The court's characterization of the parties' standard of living was not contrary to the manifest weight of the evidence, and its determination that this factor weighed in Christopher's favor was not an abuse of discretion. The same is true for the court's determination that Christpher was disabled, with severely limited earning potential. Finally, the court did not find that Christopher was depressed or that this depression prevented him from working. Instead, it found that even if mental illness or addiction contributed to Christopher's lower earning potential, this would not *per se* affect maintenance. Mary provides no other reasons for us to disturb the trial court's determinations, so we decline to do so.

¶ 49                              B. Marital Assets and Debts

¶ 50          Mary next asks us to reverse the trial court's allocation of marital debts and assets. "The court has broad discretion in the distribution of marital assets." *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1042 (2008). "The touchstone of proper and just apportionment is whether it is equitable in nature." *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 778 (1998). "An award

of property in just proportions does not mean equal proportions, and a trial court does not abuse its discretion in awarding a larger share of the marital property to one party." *Walker*, 386 Ill. App. 3d at 1042.

¶ 51    Section 503(d) of the Marriage Act lists factors for a trial court to consider in allocating marital debts and assets. 750 ILCS 5/503(d) (West 2024). Here, the trial court found that the parties' relevant economic circumstances favored a greater award for Christopher because of Mary's substantially higher income and Christopher's medical conditions, although it also acknowledged Mary's childcare obligations. See *id.* § 503(d)(5). As with its maintenance analysis, the court determined that the parties' age, health, station, occupation, income, skills, employability, estate, liabilities, and needs favored Christopher. See *id.* § 503(d)(8). It reached the same conclusion regarding each parties' opportunity for future acquisition of capital assets and income, at least "to a limited extent." See *id.* § 503(d)(11). The court treated Mary's custody of her grandchildren as a factor supporting a greater award for her. See *id.* § 503(d)(9). The court found the remaining factors were "neutral" or favored neither party, including each party's contribution to the value of marital and nonmarital property. See *id.* § 503(d)(1). Based on these factors, the trial court awarded Christopher a net total of $62,000.48 in assets and awarded Mary a net total of $58,450, plus the 2023 income tax returns.

¶ 52    Mary claims that the trial court abused its discretion in allocating debts and assets. First, she argues that the court erred by treating the parties' contributions to the marital estate as a neutral factor. According to Mary, she paid the household bills and the loan payments on the parties' cabin and vehicles throughout their marriage. When Christopher received his inheritance and his SSDI back pay and cashed in his 401(k), he used these funds to purchase vehicles and other luxuries for himself, some of which he later sold. Mary insists Christopher could have worked

after receiving SSDI, and he chose not to. She insists that the court failed to acknowledge that she contributed much more to the marital estate than he did.

¶ 53    We disagree. Although Mary was the primary breadwinner for much of the marriage, the trial court reasonably found that Christopher provided the couples' primary source of income at the beginning of their marriage. Christopher also testified that, at the beginning of the couple's relationship, he alone made regular payments on their home. Even after Christopher lost his job, he contributed to living expenses, groceries, and meals at restaurants. Christopher spent money on luxuries, like the camper, but Mary also used these, at least somewhat. Mary also spent money traveling. Deferring to the trial court, we reject Mary's assertion that Christopher simply chose not to work. The court accepted that Christopher was disabled, and that finding was reasonable. The court determined that any discrepancy between Mary's and Christopher's contributions to the marital estate was not so great as to warrant a greater award to Mary. This determination was not contrary to the manifest weight of the evidence, and the court did not abuse its discretion by treating this as a neutral factor.

¶ 54    Next, Mary argues that the trial court erred by dividing her 401(k) between her and Christopher. She insists that the court's decision was not equitable and that the court failed to adequately explain this decision. Especially because of her obligations to her two grandchildren and her own health problems, she claims the court abused its discretion by awarding Christopher half of her 401(k).

¶ 55    Again, we disagree. Mary concedes that her 401(k) was part of the marital estate. Therefore, the trial court rightly considered Mary's 401(k) as part of the overall value of the debts and assets to be divided. Although the court did not explain specifically why the 401(k) should be split in half, it thoroughly reviewed the statutory factors and explained why it allocated the debts

and assets as it did, awarding slightly more to Christopher over Mary. Mary offers no reason to separate the 401(k) from the other assets, and we do not find that the trial court was required to do so.

¶ 56 Finally, Mary contends the trial court misunderstood her testimony regarding Christopher's SSDI back pay. Mary testified that Christopher received $56,000 in SSDI back pay during the marriage. However, the court allocated a SSDI back pay "debt" to Christopher. This debt did not exist, and neither party testified that it did.

¶ 57 Mary is correct that the trial court's factual finding that the Christopher had a debt associated with his SSDI back pay was contrary to the manifest weight of the evidence. As she observes, no witness testified to this, and the evidence showed only that Christopher received a $56,000 payment from SSDI.

¶ 58 In response to this clear error, Christopher simply asserts that the error was "harmless" because the trial court's division of marital debts and assets was otherwise nearly equal and the court assigned no value to this "debt" in its chart in Exhibit A. The court found it "equitable" that Christopher be responsible for this debt, but it did not specify the balance of the debt. Instead, the court simply treated this "debt" as a reason for " 'tipping the scales' a bit in his favor in terms of the distribution of the other assets and debts."

¶ 59 We cannot be sure that the trial court's error had no effect on its allocation of debts and assets. Contrary to Christopher's argument, we do not find it decisive that the court's allocation was otherwise nearly equal, as "[a]n award of property in just proportions does not mean equal proportions." *Walker*, 386 Ill. App. 3d at 1042. Moreover, because the court assigned no value to the debt, we cannot determine precisely how this error affected its judgment. At the very least, the court considered this debt to be a reason to " 'tip[ ] the scales' " in Christopher's favor, suggesting

at least some impact on the court's overall distribution. In this context, we find that the proper remedy is to reverse the allocation of marital debts and assets and to remand so that the trial court can reevaluate its allocation without this error. See *In re Marriage of Johns*, 311 Ill. App 3d 699, 704 (2000) (remanding for reconsideration of the entire property division where the trial court incorrectly disregarded a presumption that the marital residence and its associated lot and garage were marital property and it was "unclear" how this error affected the rest of its judgment). If the SSDI error had no significant effect on the court's allocation, it need not dramatically alter its allocation on remand. But reversal and remand will allow the court to correct any possible effect the error may have had.

¶ 60                                      C. Attorney Fees

¶ 61            Finally, Mary challenges the trial court's order that she pay $3,000 of Christopher's attorney fees. Section 503(j) of the Marriage Act allows the court to grant a party's petition for contribution to fees and costs. 750 ILCS 5/503(j) (West 2024). Section 503(j)(2) instructs the court to consider the criteria for dividing marital property in section 503 of the Marriage Act and the criteria for awarding maintenance in section 504. *Id.* § 503(j)(2). On review, "[t]he circuit court's decision to award attorney fees will not be disturbed absent an abuse of discretion." *In re Marriage of Heroy*, 2017 IL 120205, ¶ 13.

¶ 62            We reverse the trial court's award of attorney fees. As stated above, the court erroneously allocated marital debts and assets based on an SSDI debt that did not exist. This allocation included ordering Mary to pay $3,000 of Christopher's attorney fees. The court did not elaborate on this decision, other than saying it made this decision "[f]or the same reasons already articulated in this order." Although the court could properly consider the factors for dividing marital property when deciding whether to award attorney fees (see 750 ILCS 5/503(j)(2) (West

- 19 -

2024)), because the court erred in allocating debts, that same erroneous reasoning may have affected its attorney fees award. The trial court must reconsider its award of attorney fees, along with its reconsideration of the allocation of marital property.

¶ 63    Therefore, we reverse the trial court's order requiring Mary to pay Christopher's attorney fees. We also reverse the trial court's allocation of marital debts and assets, but we affirm its decision regarding maintenance.

¶ 64                    III. CONCLUSION

¶ 65    For the reasons stated, we affirm the trial court's judgment in part and reverse it in part, and we remand for further proceedings.

¶ 66    Affirmed in part and reversed in part; cause remanded.